John Berryhill, Ph.d. Esq.(*pro hac vice*)
204 East Chester Pike
First Floor, Suite 3
Ridley Park, PA 19078
+1.610.565.5601
+1.267.386.8115 fax
john@johnberryhill.com

Sean Kealii Enos (#023634)
Jeffrey W. Johnson (#024435)
SCHMEISER, OLSEN & WATTS, LLP
18 E. University Drive, Suite 101
Mesa, Arizona 85201
Telephone: (480) 655-0073
Facsimile: (480) 655-9536
kenos@IPlawUSA.com
jjohnson@IPlawUSA.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

David Dent, an Individual,

                                    Plaintiff,

          vs.

Lotto Sport Italia S.p.A, an Italian
Corporation,

                                    Defendant.

Case No. CV 17-651-PHX-DMF

**PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT**

TABLE OF AUTHORITIES

**Cases**

*AIRFX.com v. AirFX LLC*, No. CV 11-01064-PHX-FJM, 2012 WL 3638721, (D. Ariz. Aug. 24, 2012)............................................................................................. 10, 15

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)8

*Anti–Monopoly, Inc. v. General Mills Fun Group,* 611 F.2d 296 (9th Cir.1979)............ 17

*Assurance Co. of Am. v. Wall & Assocs. LLC of Olympia*, 379 F.3d 557 (9th Cir. 2004)  7

*Barcelona.com, Inc. v. Excelentisimo Ayuntamiento De Barcelona*, 330 F.3d 617 (4th Cir. 2003)................................................................................................8

*Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672 (9th Cir. 2005)....................................15

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036 (9th Cir.1999).....16

*Chambers v. Time Warner*, 2003 WL 749422 (S.D.N.Y. 2003)........................................3

*Classic Media, Inc. v. Mewborn*, 532 F.3d 978 (9th Cir. 2008) ......................................18

*Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*, 198 F.3d 1143 (9th Cir. 1999)...................................................................................................17

*Gioconda Law Grp. PLLC v. Kenzie*, 941 F. Supp. 2d 424 (S.D.N.Y. 2013) .................13

*GoPets Ltd. v. Hise*, 657 F.3d 1024 (9th Cir. 2011)..............................................9, 10, 16

*Gracie v. Gracie*, 217 F.3d 1060 (9th Cir. 2000)............................................................18

*Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936 (9th Cir. 2002) .................12

*KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.,* 408 F.3d 596 (9th Cir.2005) ......................................................................................................17

*Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190 (9th Cir. 2009)................................................11

*New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287 (S.D.N.Y. 2015) .........14

*Richards v. Nielsen Freight Lines*, 810 F.2d 898 (9th Cir. 1987)......................................8

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 718 F.2d 327 (9th Cir. 1983), <u>rev'd,</u> 469 U.S. 189, 105 S. Ct. 658, 83 L. Ed. 2d 582 (1985) ..............................................18

*Sabin v. Curt Mfg. Co.*, No. CV-08-1852-PHX-SRB, 2009 WL 10673588 (D. Ariz. May 4, 2009)..............................................................................................14

*Sallen v. Corinthians Licenciamentos LTDA*, 273 F.3d 14 (1st Cir. 2001) ......................8

*Strong Coll. Students Moving Inc. v. Coll. Hunks Hauling Junk Franchising LLC*, No. CV-12-01156-PHX-DJH, 2015 WL 12602438 (D. Ariz. May 15, 2015) .....................9

*Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778 (9th Cir. 2002)........................................8

*Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264 (4th Cir. 2001) ............... 12

*Wang v. Societe du Figaro S.A.*, No. 15CV9376PAEJLC, 2018 WL 566407 (S.D.N.Y. Jan. 26, 2018) ........................................................................................... 13, 14

*Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925 (9th Cir. 2005).................................................................................................... 17

**Statutes**

15 U.S.C. § 1114(2)(D)(v) ........................................................................... 3, 4

15 U.S.C.A. § 1125(d)(1)(A) ……………………………………………………….

15 U.S.C. § 1125(d)(1)(B)(ii)……………………………………………………….

**Rules**

Federal Rules of Civil Procedure 56(a)........................................................... 2, 3

Plaintiff hereby moves the Court for summary judgment under Rule 56, Federal Rules of Civil Procedure, with respect to all of Plaintiff's claims.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   BACKGROUND

This case is about lottostore.com and lottoworks.com ("Disputed Domains") purchased by David Dent ("David"), a businessman with decades of experience in lottery businesses, for use with his lotto/lottery-related activities.  Defendant filed a UDRP proceeding in which it obtained an order to transfer the Disputed Domains to Defendant, forcing David to file the Complaint to retain them.  David seeks summary judgment on his reverse domain name hijacking ("RDNH") and declaratory relief claims.  David did not "register" or "use" the Disputed Domains under the relevant statutes, but even if he did, did not do so in bad faith.  In any case, he is entitled to protection by the relevant safe harbor.  Accordingly, Plaintiff respectfully requests that the Court grant this Motion.

### A.  David's Extensive Gambling/Lottery Experience

David has worked in the gambling/lottery industry since at least as early as 1999 through the present (since 2005 with the company he founded, Trimark).  (Plaintiffs' Statement of Facts in Support of Motion for Summary Judgment (hereafter "SF") at ¶¶1, 10.)   His extensive experience in that industry includes many types of gambling, many roles and disciplines, management, and ownership.  (*Id.* at ¶2.)  His lottery-related activities span the globe, and have involved millions of customers and dozens of business clients and partners. *See id.* at ¶¶ 3-18.)  His financial investment in these activities has been extensive over the past 6 years, and amounts to more than $800,000. (*Id.* at ¶ 86.) He has been directly involved with the development and marketing of numerous gambling-related products. (*Id.* at ¶¶ 5-9, 11-13, 15-18.)  He owns over 150 domains, the vast majority of which are gambling related.  (*Id.* at 86.)

### B.  David's Online Gambling Expansion Efforts (Secondary Lottery)

In Spring 2016, David began work, with his company Trimark and international business associates with whom he previously worked,  on a new online gambling venture

(online secondary lottery). (*Id.* at ¶¶ 19-23.)  The business includes a consumer (B2C) portion offering lotto/gambling directly to consumers in a store-like format (a "lotto store"), and a business (B2B) portion holding the bookmaking license and creating and managing the lottery product offerings to be sold via lottostore.com and possibly through other storefronts and third-party lottery businesses (a lotto "factory" or "works").  (*Id.* at 32.)  During May to December of 2016, David and his partners worked extensively laying the groundwork for the business. (*Id.* at ¶¶ 25-27,31-33, 35-40, 44-46, 84.)  Their efforts included identifying domains that users would directly associate with their online lottery offerings, and that would therefore drive traffic to the business. (*Id.*  at ¶ 25.)  In approximately June 2016, David began searching for domains for the business, including specifically domains that included lotto, lottery and other gambling terms descriptive of the businesses products and services (secondary lottery).  (*Id.*  at ¶ 24.)  As part of this process, David discovered, among others, lottostore.com.  In September 2016, David and his partners specifically discussed lottostore.com and how ideal it was for the business due to its descriptive nature.  (*Id.*)  David's business associate Ashley suggested he proceed with the purchase of lottostore.com, and on September 22, 2016, David purchased it.  (*Id.* at ¶¶ 27-28.)  Later in the development process (late 2016), David also discovered lottoworks.com, saw its value as descriptive of the B2B business, and purchased it on December 5, 2016.  (*Id.* at ¶¶ 33-34, 43.)

**C. Disputed Domains Status Post-Purchase to Present**

From the time David purchased the Disputed Domains (and before), they have remained parked and unused by David.  (*Id.* at ¶¶ 62-63, 101.)  On December 18, 2016, David first noticed that Sedo's escrow service had not updated the nameservers to GoDaddy's parking page during the transfer, and requested, via his account portal, that GoDaddy change them to GoDaddy's "non-cash" parking service  nameservers.  (*Id.*  at ¶ 51.)  On December 20, 2016, the domain parking was changed to GoDaddy's "non-cash" parking service, where it remains parked to this day.  (*Id.*  at ¶ 53.)  Lottoworks.com remains parked at Parkingcrew.com to this date because by the time (December 18, 2019)

David discovered that Sedo's escrow service had not updated the nameservers to GoDaddy's parking page during the transfer, lottoworks.com was locked due to Defendant's UDRP complaint, preventing David from changing the nameservers.  (*Id.* at ¶¶ 49, 50, 52, 61.)  David has never used the Disputed Domains, and has never caused any advertising or other content to be displayed in association with them. (*Id.* at ¶¶ 64-68, 102.)  David has not posted any content at the Disputed Domains, and has not created a website for them. (*Id.* at ¶¶ 64-68, 103.) They remain parked at "splash pages" provided and controlled by the parking platform providers (GoDaddy for lottostore.com and ParkingCrew for lottoworks.com).[1] (*Id.* at ¶¶ 70-76, 78, 94-96.) David has no control over any content displayed on the splash pages and derives no revenue from the content placed by GoDaddy or Parkingcrew on the splash pages (he has never enabled "cash parking" on any of his domains). (*Id.* at ¶¶ 54, 66, 69, 70, 76, 78, 94-96.)

Since the locking of the Disputed Domains as a result of Defendant's UDRP filing in December, 2016, David has been unable to change any of their dns (parking) and other key settings. (*Id.* at ¶¶ 50, 52, 54, 56, 60, 61, 63.) In other words, they are stuck where they happened to be when they were locked due to Defendant's UDRP filing.  In fact, lottoworks.com was locked even before David knew there was a dispute or that Sedo had not updated the lottoworks.com nameservers to GoDaddy's non-cash parking page, and only a few days after control was transferred to him.  In fact, David had a window of <u>at most</u> 5 days where he could even have made changes to the nameservers for lottoworks.com. (*Id.*  at ¶ 50.)  Any "click to buy" or equivalent links displayed on the parked pages are not offers for sale, but rather, are offers by the parking page to contact the owner to see if they might sell. (*Id.*  at ¶ 59.)  David has never offered the Disputed Domains for sale.  (*Id.*  at ¶ 89.)  Indeed, he has been prevented from controlling or using them since they were locked in <u>December, 2016</u>.  (*Id.*  at ¶ 60.)  More specifically, it has

---

[1] A "splash page" is the first page that appears when a website is visited.  *See Chambers v. Time Warner*, 2003 WL 749422, at *7 (S.D.N.Y. Mar. 5, 2003)).

been impossible for David to use the domains at all since the lock because they are locked pointing nameservers over which David has <u>no control</u> (they are in fact controlled by ParkingCrew (lottoworks.com) and GoDaddy (lottostore.com).  (*Id.*)  To use the domains, they must be unlocked so that David can  set them to nameservers that he controls.  (*Id.*)

Lotto's actions have forced David to delay launching his business pending the outcome of this litigation because the lock has prevented him from having the use of the domain names.  (*Id.*  at ¶ 83.)   In spite of this, he has still spent a substantial amount on developing the business since December 2016 (in excess of $200,000).  (*Id.*  at ¶ 83.)

**D.  Additional Secondary Lotto Business Development Activities**

Since about the time of his purchase of lottostore.com, David's team has been comprehensively working on the launch of the secondary lottery business (*Id.* at ¶¶ 20-47).  These activities have cost hundreds of thousands of dollars. (*Id.* at ¶ 84).  David plans to publicly launch the business upon completion of the back-end software and resolution of this lawsuit. (*Id.* at ¶¶ 88-90). He has not advertised or sold any products or services using the lottoworks.com or lottostore.com domains.  (*Id.* at ¶92). Both domains remained parked at a "splash page" provided by the registrars, and have been parked since David's purchase.  David receives no revenue from advertisements, if any, placed by the registrars on parking pages. In sum, David has not used the domains at all.  David believes that because the domains are directly descriptive of his business, they remain the best domains for him to use for his business, and he remains eager to use them once this dispute is resolved.

**E.  Lottostore.com**

Lottostore.com was first registered on January 4, 2011.  (*Id.* at ¶¶ 100). David purchased the domain on September 22, 2016. (*Id.* at ¶ 28). Defendant did not (and still does not, to Plaintiff's knowledge) have any registration or rights in the descriptive term "lottostore", so the original registration of the <u>domain</u> lottostore.com is senior to any rights (if any) Defendant Lotto claims it has in lottostore.com. On its face, Lottostore is

generic and/or descriptive of a store that sells lotto/lottery related products. (*Id.* at ¶ 80, 81). Lotto means a game of chance or a lottery.  (*Id.* at ¶ 80.)  Store means a place where merchandise is offered for sale (for example, a shop).  (*Id.* at ¶ 81.)  Defendant admits this as well (that "store" refers to a shop or a store).  (*Id.*.)  *See* also Exhibit L, Declaration of Steven Adams ("Adams Decl."), at Exhibits 1 and 3, which include dictionary definitions for these terms).  The USPTO has routinely required disclaimers for trademark registrations that include the terms lotto or store, recognizing that they are descriptive/generic of those goods.  *See* Exhibit L, Declaration of Steven Adams ("Adams Decl."), at Exhibits 4 and 5.  These exhibits show hundreds of disclaimers for lotto and thousands for store due to the descriptive nature of those marks.  More specifically, and directly on point, the USPTO has specifically required, for the only two US registered marks including the term lotto store (US Registration 2930996 and 2930997 for PRIMM VALLEY LOTTO STORE) a disclaimer of the term lotto store for BOTH marks as being merely descriptive of the goods and services offered by the business applying for the mark (a lottery services provider).  Specifically "The applicant must disclaim the descriptive wording "LOTTO STORE" apart from the mark as shown.  Trademark Act Section 6, 15 U.S.C.Section 1056; TMEP sections 1213 and 1213.03(a).  The wording is merely descriptive because it describes the type of service provided."  *See* Exhibit L, Declaration of Steven Adams ("Adams Decl."), at Exhibit 7. Lotto store is clearly descriptive of the businesses for which David purchased the domains for his B2C offerings, and Plaintiff cannot exclude him from using it for gambling and lottery goods and services, simply because it uses the term with clothing.

### F.  Lottoworks.com

Defendant claims that its rights in the term lottoworks began in 2009. (SF at ¶ 98.) Lottoworks.com was first registered on July 30, 1998.  more than 10 years prior to Defendant's alleged first use of the term lottoworks. (*Id.* at ¶ 99.)  David purchased the domain on December 5, 2016. (*Id.* at ¶ 43.)  On its face, Lottoworks is generic and/or descriptive of a place that makes/creates/offers lotto/gaming related products.  Lotto

means a game of chance or a lottery.  (Adams Decl. at  Exhibit 3.)  One of the meanings of "works" is a place where goods or services are provided or made like a plant or a factory. (*Id* at Exhibit 1.)  The USPTO has routinely required disclaimers for trademark registrations including lotto or works, recognizing that those terms are descriptive/generic of the claimed goods/services.  *See* Adams Decl. at Exhibit 4 and 6.  These exhibits show hundreds of disclaimers for lotto and thousands for works due to the descriptive nature of those marks.  (*Id.*)  Lottoworks describes the business for which David purchased it, a business that makes and offers lotto products.   (SF

**G. Defendant Are In Completely Different Businesses**

Defendant is a clothing company (specifically including shoes), and its trademarks are for those related goods, not gambling or lottery.  David is in a completely different business (lottery). (SF at ¶ 1, 93.)  David had no knowledge of Defendant until his domains were locked due to Defendant's UDRP complaint, AFTER purchasing the Disputed Domains.  (SF at ¶ 79.)

**H. David Did Not Offer To Sell The Disputed Domains**

David owns over 150 domains related to gambling/lotto, purchased over the past 10+ years. (SF at ¶ 86.)  Of these, over 130 relate specifically to lotto, lottery, types of lottery, jackpots, lucky, scratchcards and bingo, and most were bought specifically for David's new lottery project since May of 2016.  (*Id.*)  Many include "lotto" or "lottostore" because they are specifically intended to describe David's business.  David has never offered to sell the Disputed Domains.  He has always intended to use the Disputed Domains for the secondary lotter business.  (*Id.* at ¶ 88.) He has from time-to-time owned other domains for other legitimate businesses or purposes.  (*Id.* at ¶ 97.)  He had never (before Defendant's UDRP action) been accused of "cybersquatting."  (*Id.* at ¶ 91.) David never contacted Defendant offering to sell the Disputed Domains (the characteristic signature of a "cybersquatting" violation), and was not even aware of Defendant until AFTER the Defendant's UDRP filing (AFTER purchasing the domains).

**II.   ARGUMENT**

### a. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Assurance Co. of Am. v. Wall & Assocs. LLC of Olympia*, 379 F.3d 557, 560 (9th Cir. 2004) (citation omitted); see also Fed. R. Civ. P. 56(a).  Once the moving party has carried its initial burden, "the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense." *Richards v. Nielsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987) (citing *Gen. Bus. Sys. v. N. Am. Philips Corp.*, 699 F.2d 965, 971 (9th Cir. 1983)). The opposing party "may not rely merely on allegations or denials in its own pleading;" rather, it must set forth "specific facts showing a genuine issue for trial." *See* Fed.R.Civ.P. 56(e)(2); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 25056, 2511, 91 L. Ed. 2d 202 (1986). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment'" *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 784-85 (9th Cir. 2002) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

Defendant has not set forth "***specific facts*** showing a genuine issue for trial".

### b. David Is Entitled To Summary Judgment On His Claims

Reverse Domain Name Hijacking (15 U.S.C. § 1114(2)(D)(v)) occurs when "trademark owners abusively assert their trademark rights to strip domain names from rightful owners." *Sallen v. Corinthians Licenciamentos LTDA*, 273 F.3d 14, 17 (1st Cir. 2001). To prevail, the registrant must show: (1) it is a domain name registrant; (2) its domain name was suspended, disabled or transferred under a policy implemented by a registrar; (3) the owner of the mark that prompted the domain name to be suspended, disabled or transferred has notice of the action; and (4) its registration or use of the domain name is not unlawful. 15 U.S.C. § 1114(2)(D)(v); *Barcelona.com, Inc. v. Excelentisimo Ayuntamiento De Barcelona*, 330 F.3d 617, 626 (4th Cir. 2003).  Elements 1-3 are not disputed.  (Dkt. 17 at p.4.)  The only remaining question is whether

"Plaintiff's registration or use of the domain names lottoworks.com and lottostore.com was not unlawful." (*Id.*.)  For his registration or use to be "not unlawful", David would need to demonstrate "either (1) he did not register, traffic, or use a domain name that is identical or confusingly similar to a distinctive mark, or (2) he did not have a bad faith intent to profit from that mark.  15 U.S.C.A. § 1125(d)(1)(A)."  (*Id.*  at p.5)

David also seeks a declaration that his actions were not unlawful, which is directly related to the RDNH analysis.  "In other words, in the language of the relevant statutes, Plaintiffs are seeking a declaration that the registration of the disputed domain name was "not unlawful[,]" *see* 15 U.S.C. § 1114(2)(D)(v), which encompasses a finding that Plaintiffs "did not have a bad faith intent to profit" from any of Defendants' three trademarks. *See* 15 U.S.C. § 1125(d)(1)(A)(i)."  *Strong Coll. Students Moving Inc. v. Coll. Hunks Hauling Junk Franchising LLC*, No. CV-12-01156-PHX-DJH, 2015 WL 12602438, at *8–9 (D. Ariz. May 15, 2015).  Finally, David's actions fall under the safe harbor provision.

Summarizing, David prevails if he did not <u>register or use</u> the domain names, <u>**or**</u>, if he did register or use them, <u>that it was not with a bad faith intent to profit</u>, <u>**or**</u> <u>if the safe harbor applies</u> because he had "reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii).

### i.   David Did Not "Register" As Defined For RDNH/ACPA

Undisputed facts demonstrate that David did not, "register" the Disputed Domains. The Ninth Circuit addressed "registration" in *GoPets Ltd. v. Hise*, 657 F.3d 1024 (9th Cir. 2011).  In *GoPets*, defendants registered "gopets.com" in March 1999. *Id.* at 1026. In 2004, plaintiff GoPets Ltd. was created, and plaintiff filed a trademark application alleging its first use of the "gopets" mark in August 2004. *Id.* at 1027. In 2006, the defendants transferred gopets.com to Digital Overture. *Id.* at 1028. The Ninth Circuit considered whether the transfer of gopets.com to Digital Overture constituted "registration" under the ACPA. It concluded that "Congress meant 'registration' to refer only to the initial registration" and that "[w]e see no basis in ACPA to conclude that a

right that belongs to an initial registrant of a currently registered domain name is lost when that name is transferred to another owner." *Id.* at 1031. Thus, "[b]ecause Edward Hise registered gopets.com in 1999, . . . Digital Overture's re-registration and continued ownership of gopets.com does not violate §1125(d)(1)." *Id.* at 1032. In other words, if a domain is legitimately first registered and has senior rights to a trademark, simply transferring that registration to a third party ("re-registration") does not act to take away the priority of that registration over later-acquired trademark rights.

Importantly, *GoPets* did not distinguish between transfers of a domain name to related parties and other domain transfers. Rather, *GoPets* reasoned that if an original owner's rights associated with a domain name were lost upon transfer to "another owner," the rights to many domain names would become "effectively inalienable," a result the intention of which was not reflected in either the structure or the text of the ACPA. *Id.* at 1031-32. In *AIRFX.com v. AirFX LLC*, this District had an opportunity to apply *GoPets*. *AIRFX.com v. AirFX LLC*, No. CV 11-01064-PHX-FJM, 2012 WL 3638721, (D. Ariz. Aug. 24, 2012). The *AirFX* court held that because airfx.com was registered more than two years before the AirFXmark existed, "plaintiffs' later re-registration of airfx.com 'was not a registration within the meaning of § 1125(d)(1).'" *Id.* at *4 (citing *GoPets* 657 F.3d at 1032). "Rather, because Bestinfo registered airfx.com 'long before [defendant] registered its service mark,' plaintiffs' registration and ownership of airfx.com 'does not violate § 1125(d)(1).'" *Id.* "Plaintiffs are therefore entitled to summary judgment on defendant's cybersquatting counterclaim." *Id.*

The undisputed facts here are even more favorable to David than those of *GoPets* and *AIRFX*.. Lottoworks.com first registered on July 30, 1998. Lotto's claimed first use of lottoworks was in 2009, almost 10 years after the domain registration. (SF @?). Under *GoPets*, David's 2016 purchase of lottoworks.com from its then-owner did not terminate the senior rights already existing in that domain over any rights Defendant might have later developed. The same applies to lottostore.com, first registered on January 4, 2011. (SOF). Defendant did not (and does not) have or claim trademark registration or rights in

the descriptive term "lottostore."  Indeed it cannot ,as the term is merely descriptive. Consequently, the original registration of the domain lottostore.com is senior to rights (if any) Defendant claims it has in lottostore.com.  Applying *GoPets* (and consistent with *AirFX*), the senior status of both Disputed Domains (registered before Defendant claimed rights in lottoworks and lottostore) was not lost simply because the domains were transferred to David, and the transfer of the domains to David is not "registration" under the ACPA/RDNH.

ii.  <strong>David Did Not Use the Domains</strong>

David has not used either of the Disputed Domains.  Indeed, he has not had an opportunity to use them since they remain locked due to Defendant's UDRP claim and this dispute.  Lottostore.com was parked when David purchased it in September 2016, and it has remained parked.  On December 23, 2016, the domain was locked, preventing David from using it. (SF at ¶ 54.)  Lottoworks.com was parked when David purchased it on December 5, 2016, and it has remained parked.  On December 15th, the domain was locked, preventing David from using it.  (*Id.*  at ¶ 61.)  BOTH domains have remained parked (unused by David) during the <u>entire time</u> he has owned them and indeed from BEFORE he even purchased them.  They were parked at sites that did NOT have "cash parking" or its equivalent enabled, David did not derive any revenue from those sites, and had absolutely no control over any content displayed at the parking splash pages of the registrars.  (SF at ¶ 87.)  Finally, David did not attempt to sell the domains to Defendant or anyone else.  There are simply no facts remotely supporting any use on David's part, let alone any "bad faith" use (discussed below).

Defendant has provided NO "specific facts showing a genuine issue for trial" with respect to registration or use.  Consequently, there has been no registration or use of the Disputed Domains by David.  The evidence is completely consistent with David simply purchasing two descriptive domains for legitimate use in his gambling/lottery-related endeavors, something completely within his rights to do.

<tt>iii.</tt>  <strong>Registration Or Use, IF ANY, Was Not In Bad Faith</strong>

Even if this Court finds "registration" (in spite of *GoPets)*, or "use", the uncontroverted evidence shows that there was no <u>bad faith</u> registration or use by David. "Congress has enumerated nine nonexclusive factors for courts to consider" in evaluating bad faith. *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1202 (9th Cir. 2009) (citing 15 U.S.C. § 1125(d)(1)(B)(i)). Courts typically do not "march through the nine factors seriatim because the ACPA itself notes that use of the listed criteria is permissive." *Id.* (citing *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 269 (4th Cir. 2001). "'[T]he most important grounds for finding bad faith are "the unique circumstances of the case, which do not fit neatly into the specific factors enumerated by Congress."'" *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 946–47 (9th Cir. 2002) (quoting *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 271 (4th Cir. 2001)). The unique circumstances here make a review of the nine permissive factors unnecessary, but we briefly review them for completeness' sake: 1. (IP rights in domain). The domains are descriptive of David's intended goods, giving him a "fair use" right to use them. 2. (Domain refers to person). The names do not refer to David. 3. (Prior use of domain with goods). No known prior use (although the domains were first registered prior to any Lotto-claimed rights in lottostore or lottoworks). 4. (Noncommercial use of the mark with domain). Not applicable (David has not used domains, and his proposed usage would be fair use because they describe his goods). 5. (Intent to divert consumers from owner for commercial gain or with the intent to tarnish/disparage). David had no knowledge of Defendant or its marks prior to its UDRP complaint, and so could not have intended to divert at the time of purchase, and furthermore has never had the intent to divert or cause confusion. Furthermore, the domains describe David's goods, and therefore would not cause confusion. 6. (Offer to sell domains for financial gain). David never offered to sell the domains to anyone, has no prior pattern of such conduct, and has always intended to use them in the bona fide offering goods/services. 7. (Provision of false contact information). David never engaged in such conduct. 8. (Registration of multiple domains the person knows are

identical/confusingly similar).  David had no knowledge of Defendant or its marks at the time of registration.  The domains describe the goods/services for which David purchased them.  In any case, there are no allegations that he ever used the domains with goods or services in any way related to goods covered by Defendant's marks, making it impossible for there to be confusion.  9. (Extent to which mark incorporated in the domain name is distinctive/famous) – Defendant's marks are not famous.  Rather, they are generic/descriptive of the goods to be offered, and could not be distinctive for them.

At <u>best</u> (from Defendant's perspective), factors 1-4 are neutral (1 and 4 arguably favor David).  Factors (5-9) favor David.  Regardless, the purpose of the optional factors is to help determine if there was bad faith.  Unique factors of this case make consideration of them unnecessary.  There is no evidence even suggestive of bad faith on David's part with respect to the domains, and "bad faith" is what is required to violate the ACPA (and key in a RDNH determination).  David pursued a lottery business and purchased names directly descriptive of that business.  Nothing more.

Other cases are informative.  *Wangs v. Societe du Figaro S.A.* involved a famous French newspaper (Le Figaro) and a person (Wang) who claimed he registered a domain "lefigaro.news" to start an opera blog.  *Wang v. Societe du Figaro S.A.*, No. 15CV9376PAEJLC, 2018 WL 566407, at *1 (S.D.N.Y. Jan. 26, 2018), *report and recommendation adopted in part, rejected in part,* No. 15 CIV. 9376 (PAE), 2018 WL 3122055 (S.D.N.Y. June 26, 2018). He claimed that he named it after an opera, had no knowledge of French or personal/ business dealings with the French (effectively, that he was not aware of the newspaper le figaro), and did not try to sell the domain.  *Id.* at *12. The court found for Wang, noting that "[e]ven though many of the enumerated factors do not tip in Wang's favor, the Court takes a 'case-specific approach to bad faith' and concludes that Wang has articulated a legitimate, good-faith basis for registering <lefigaro.news>, and evidence that he had a 'bad faith intent to profit' from the domain name is absent from the record." *Id.* at *14 (citing *Gioconda Law Grp. PLLC v. Kenzie*, 941 F. Supp. 2d 424, 433 (S.D.N.Y. 2013)). The court concluded that his registration and

use of <lefigaro.news> did not violate the ACPA because the bad-faith element was not met, and that "Consequently, the fourth (and final) element of Wang's claim of reverse domain-name hijacking under subsection (v) is satisfied, as Wang's registration and use of <lefigaro.news> was 'not unlawful' under the ACPA." *Id.* (citing 15 U.S.C. § 1114(2)(D)(v)). The court found for Wang even though he had used the domain.  The court noted that "[e]ven assuming that Wang prepared his first blog post to bolster his claim that he was an aspiring opera and arts blogger, this fact does not demonstrate that Wang registered or used the domain name for commercial gain at defendants' expense." *Id.* at *13.  The court further noted that "[a]lthough defendants emphasize that Wang never updated his website after his initial post, the lack of activity is unsurprising given that the commencement of the UDRP proceeding put his ownership of the domain name in jeopardy and that the UDRP panel ordered that the domain name be transferred to defendants.  In short, defendants have simply failed to present any evidence to contradict Wang's assertions that he registered <lefigaro.news> to start an opera and arts blog without any intent to profit in bad faith at defendants' expense."  *Id.*  Finally, the court stated that "This case is thus outside the 'ACPA's heartland.' *See New World*, 150 F. Supp. 3d at 325 (citation omitted). Defendants have not suggested that Wang sought to sell <lefigaro.news> to defendants at an "exorbitant price." *See id.* Nor is there any evidence that Wang attempted to divert *Le Figaro* readers to his own website for commercial gain. *See id.*" *Id.* (citing *New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 325 (S.D.N.Y. 2015)).  *See also Sabin v. Curt Mfg. Co.*, No. CV-08-1852-PHX-SRB, 2009 WL 10673588, at *6–7 (D. Ariz. May 4, 2009) for additional treatment of the 9 factors.

The undisputed facts show that David simply registered two domains for future use in a business of which they are directly descriptive/generic, not to re-sell them for commercial gain or take any bad faith action at Defendant's expense.  David has decades of experience in the gambling industry.  He had concrete plans to expand into the online secondary lottery market.  He had no knowledge of Defendant's existence.  At the time

he purchased the domains, his intent was to **use** them.  He never offered them for sale, and indeed they have been <u>parked</u> since their purchase.  Thus, there is no evidence that at the time David registered the Disputed Domains, he did so with a bad faith purpose of selling them for commercial gain.  *See GoPets*, 657 F.3d at 1034; *see also Interstellar*, 304 F.3d at 947 (offer to sell domain was not evidence of bad faith; offer was not made for extortion purposes).  David has decades of experience in the gambling industry, and as part of his efforts in that industry, has purchased a number of domain names directly related to that industry.  As part of a specific effort to expand his efforts in the online lottery arena, David and his team searched out and purchased domains directly related to their business plans, including the Disputed Domains.  The domains purchased are clearly generic/descriptive of gambling/lottery stores/services, both facially, based on the known definitions of the terms, and based on hundreds of applications/registrations for marks including the terms lotto, works, store and even "lotto store."  There is no evidence that David registered the domains in bad faith.

*AirFX* is also instructive in terms of bad faith use.  In *AirFX*, Plaintiffs in a RDNH case had developed a brand name, registered a domain name, started researching the design of their product, and approached potential investors and customers, but had not sold, manufactured, advertised, or marketed any product bearing the AirFX mark. *See AirFX*, 2012 WL 3638721, at *1-2. The court noted that "Defendant points to no other facts to establish plaintiffs' commercial use of the AirFX mark. Accordingly, defendant has not raised a genuine issue of material fact as to whether plaintiffs' use of the mark was commercial. Without commercial use, there is no trademark infringement. *See Bosley,* 403 F.3d at 677. Plaintiffs are entitled to summary judgment on defendant's trademark infringement counterclaim."  *Id.* at *5.

Finally, regarding "use" (if any) of the Disputed Domains, trademark infringement law prohibits "only unauthorized uses of a trademark in connection with a commercial transaction in which the trademark is being used to confuse potential consumers." *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 676 (9th Cir. 2005). If a

- 14 -

person's use of a mark is noncommercial, it does not violate the Lanham Act. *See id.* at 677 ("The question before us, then, boils down to whether [defendant's] use of BosleyMedical as his domain name was in connection with a sale of goods or services. If it was not, then [defendant's] use was noncommercial and did not violate the Lanham Act.") (internal quotation marks omitted). The act of registering a domain name, without more, does not constitute commercial use. *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1052 (9th Cir.1999). David has not sold a product using the Disputed Domains, used them to engage in advertising or marketing activities, or used them in manufacturing activities. (SF at ¶ 92). He has never developed a public website for the them, and has never placed any content on them. They have been <u>parked</u> since well <u>before</u> David purchased them, and David has not and does not control the content of the parked pages. Indeed, he has been unable to change the nameservers since December 2016 due to the register lock. David has not used the domains, in bad faith or otherwise, within the meaning of the ACPA/RCNH or Lanham Act.

In sum, David has been almost exclusively involved in the gambling/lottery business for the past two decades, he specifically sought out domains directly descriptive his business, purchased them (including the two Disputed Domains), and did not try to sell them. The Disputed Domains have been parked since long before David's purchase, and indeed have been locked pointing to parking pages since December of 2016, making it impossible since those dates for David to change the nameservers or use the domains. The evidence is completely consistent with David's intended use of the domains as descriptive of the goods and services intended to be offered by him once this dispute has been resolved. There is no evidence that David even knew of Defendant, much less purchased the domains or used them in a bad faith way to profit at the expense of Defendant. There is no evidence that even hints at bad faith registration or use on David's part (importantly, there are no allegations he used the domains with goods or services protected by Defendant's trademarks). Indeed, David could not have registered the domains according to *GoPets* given that they were registered prior to rights (if any)

1  Defendant claims in lotto works and lotto store.  More importantly (for purposes of this

2  motion), Defendant has provided NO "**specific facts** showing a genuine issue for trial."

3  Consequently, even if this Court finds that there has been "registration" or "use", there

4  has been no <u>bad faith</u> registration or use of the domains by David Dent.

5  **iv.  David Is Entitled To The Safe Harbor Protection**

6  The APCA's safe harbor provision excludes a finding of bad faith intent for

7  persons who "believed and had reasonable grounds to believe that the use of the domain

8  name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii). "A reasonable

9  belief defense must rest on a good faith intention and motivation that existed at the time

10  the challenged domain name was obtained." 5 McCarthy on Trademarks and Unfair

11  Competition § 25A:63 (5th ed.).  The undisputed facts clearly show that at the time David

12  obtained the Disputed Domains (and thereafter), he believed (and still believes) his

13  intended use was lawful.  He had a good faith intent to use them for his gambling/lottery-

14  related activities.  There is no evidence  that David purchased the Disputed Domains with

15  any intent to sell them or use them with clothing or any other goods offered by

16  Defendant.  Indeed, David had no knowledge of Defendant prior to purchasing the

17  domains.  Finally, the domain names themselves are generic/descriptive of the very goods

18  and services for which David purchased the domains, making it entirely reasonable for

19  David to have believed at the time of purchase (and to continue to believe) that his

20  purchase and proposed usage of the domains is fair use or otherwise lawful.  Case law in

21  the Ninth Circuit is supportive.  The Ninth Circuit also relies on the "who-are-you/what-

22  are-you" test. *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d

23  925, 929 (9th Cir. 2005); McCarthy, *supra,* at § 12:1 ("A mark answers the buyer's

24  questions 'Who are you?' . . . But the [generic] name of the product answers the question

25  'What are you?'"). "Under this test, '[i]f the primary significance of the trademark is to

26  describe the *type of product* rather than the *producer,* the trademark [is] a generic term

27  and [cannot be] a valid trademark.'" *Filipino Yellow Pages, Inc. v. Asian Journal*

28  *Publications, Inc.*, 198 F.3d 1143, 1147 (9th Cir. 1999) (quoting *Anti–Monopoly, Inc. v.*

*General Mills Fun Group,* 611 F.2d 296, 304 (9th Cir.1979)); *see also KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.,* 408 F.3d 596, 604 (9th Cir.2005) ("To determine whether a term has become generic, we look to whether consumers understand the word to refer only to a particular producer's goods or whether the consumer understands the word to refer to the goods themselves.") (citing *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 718 F.2d 327, 330 (9th Cir. 1983), rev'd, 469 U.S. 189, 105 S. Ct. 658, 83 L. Ed. 2d 582 (1985)).  David is entitled to protection of the safe harbor provision, and should prevail for this additional reason.

### v.  David Is Entitled To Summary Judgment

With respect to the only disputed element of David's claims (reverse domain name hijacking and declaratory relief), his registration or use of the Disputed Domains is not unlawful either under the Lanham Act or under the ACPA, entitling him to summary judgment, which is respectfully requested.

**David Is Entitled To An Award Of Attorneys' Fees**

A court has discretion to award attorneys' fees to a prevailing party under the Lanham Act in "exceptional cases." Classic *Media, Inc. v. Mewborn*, 532 F.3d 978, 990(9th Cir. 2008).  "Exceptional circumstances can be found when the non-prevailingparty's case is groundless, unreasonable, vexatious, or pursued in bad faith." *Gracie v. Gracie*, 217 F.3d 1060, 1071 (9th Cir. 2000).   This case is exceptional for at least the reason that Defendant's case was groundless (as will be established in a motion for fees), and David respectfully requests that at least on that basis, he be awarded his fees.

Respectfully submitted this 9th day of October, 2019.

                                       SCHMEISER, OLSEN & WATTS LLP

                                       By:
                                       */Jeffrey W. Johnson /*

                                       Sean K. Enos
                                       Jeffrey W. Johnson
                                       SCHMEISER, OLSEN & WATTS, LLP
                                       18 E. University Drive, Suite 101
                                       Mesa, Arizona 85201

                                       Attorneys for Plaintiff

**Certificate of Service:**

I hereby certify that on this 9th day of 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

The Honorable Deborah M. Fine

United States District Court

Marc J. Randazza, AZ Bar No. 27861

Ronald D. Green, *pro hac vice*

2764 Lake Sahara Drive

Suite 109

Las Vegas, NV 89117

Tel: 702-420-2001

Email: rdg@randazza.com

*/s/ Steven Adams*

Steven Adams