WO

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

David Dent,

        Plaintiff,

v.

Lotto Sport Italia SpA,

        Defendant.

No.  CV-17-00651-PHX-DMF

**ORDER**

Plaintiff filed his Complaint on March 3, 2017.  (Doc. 1)[1]  Count One requests a finding that Plaintiff's registration and/or use of domain names <lottostore.com> and <lottoworks.com> is not unlawful pursuant to a claim of reverse domain name hijacking under the Anticybersquatting Consumer Protection Act ("ACPA") provisions of the Lanham Act in 15 U.S.C. §§ 1114(2)(D)(v)[2].  (*Id.* at 9-10)  Count Two requests declaratory relief that Plaintiff's registration and/or use of the domain names <lottostore.com> and

---

[1] Citations to the record indicate documents as displayed in the official electronic document filing system maintained by the District of Arizona under Case Number CV-17-00651-PHX-DMF.

[2] Count One originally alleged violation of both § 1114(2)(D)(iv) and § 1142(2)(D)(v). (Doc. 1 at 9-10)  On February 12, 2018, District Judge Silver found that § 1114(2)(D)(iv) and § 1114(2)(D)(v) define separate violations, and that only § 1114(2)(D)(v) addresses reverse domain name hijacking.  (Doc. 17 at 4)  Judge Silver concluded that Plaintiff had failed to state a claim under § 1114(2)(D)(iv) for fraud in a domain dispute proceeding and dismissed any claim under that subsection.  (*Id.*)

1   <lottoworks.com> does not violate Defendant's rights under the Lanham Act.  (*Id.* at 10-

2   12 (citing 15 U.S.C. § 1125(d)(1)))  Count Three alleged tortious interference and was

3   dismissed in February 2018, with leave to amend if deficiencies in the claim were cured.

4   (Docs. 1, 17)  Plaintiff did not file an amended complaint.  Plaintiff and Defendant each

5   move for summary judgment on the remaining claims in Counts One and Two.  (Docs. 83,

6   86)

7   　　　The remaining claims in Plaintiff's Complaint request:  (1) a declaration "that

8   [P]laintiff's registration, ownership and use of the Domain Names <lottostore.com> and

9   <lottoworks.com> is lawful and proper and does not infringe on any right the Defendant

10   may claim in the United States"; (2) his "costs and expenses, including costs under 15

11   U.S.C. § 1114(2)(D)(v) and reasonable attorneys' fees"; and (3) "'an award of statutory

12   damages in the amount of not less than $1,000 and not more than $100,000 per domain

13   name, as the court considers just'" pursuant to 15 U.S.C. § 1117(d).  (Doc. 1 at 13)  In

14   Plaintiff's briefing associated with the parties' cross-motions for summary judgment,

15   Plaintiff argues he is entitled to attorneys' fees (Doc. 86 at 20, Doc. 91 at 18-19, Doc. 96

16   at 13), but does not urge entitlement to statutory damages under 15 U.S.C. § 1117(d).

17   　　　Plaintiff David Dent's and Defendant Lotto Sport Italia's cross-motions for

18   summary judgment are fully briefed.  (Docs. 83, 91, 95, 86, 89, 96)  For the reasons that

19   follow, Plaintiff's motion for summary judgment (Doc. 86) will be granted and

20   Defendant's motion for summary judgment (Doc. 83) will be denied.

21   **I.    BACKGROUND**

22   　　　Plaintiff has been engaged in the gaming industry for approximately twenty years.

23   (Doc. 87, Plaintiff's Statement of Facts "PSOF" ¶¶ 3-16)  Plaintiff's experience includes

24   ownership, development, and management of online gaming companies based in Canada,

25   the Isle of Man, and Gibraltar.  (*Id.* at ¶¶ 3-11)  In 2015 and 2016, Plaintiff discussed with

26   associates a business model for entry into the secondary lottery industry.  (*Id.* at ¶¶ 19-23)

27   In June 2016, Plaintiff began negotiations to purchase the domain name <lottostore.com>,

28   which Plaintiff avers was in support of his planned entry into the secondary lottery

industry.  (*Id.* at ¶ 24)  The original owner registered this domain name in January 2011.  (Docs. 87 at ¶ 100, 90 at ¶ 100)  In September 2016, Plaintiff purchased the domain name <lottostore.com>, which was transferred to his account with GoDaddy, an internet domain name registrar.  (Doc. 87 at ¶¶ 28-29)  Plaintiff declares he planned to establish a holding company, an online consumer lottery store using the domain name <lottostore.com> as its website, and a business to act as a bookmaking entity which would "hold the license and jackpot insurance, set odds/prices, and develop and manage the lottery products and services offered at lottostore.com."  (*Id.* at ¶ 32)

In October 2016, Plaintiff began negotiations to acquire the additional domain name <lottoworks.com> to be used by the bookmaking company he planned.  (*Id.* at ¶¶ 33-34)  The original owner had registered this domain name in July 1998.  (Docs. 87 at ¶ 99, 90 at ¶ 99)  Plaintiff purchased the <lottoworks.com> domain name in December 2016.  (Doc. 87 at ¶ 43)  Shortly thereafter, Defendant filed a World Intellectual Property Organization ("WIPO") complaint against the use of domain name <lottoworks.com> causing GoDaddy to lock this domain name.  (*Id.* at ¶¶ 48-49)

Defendant Lotto currently manufactures, markets, and distributes athletic footwear, sportswear, and sports accessories to over 110 countries, including the United States.  (Doc. 84, Defendant's Statement of Facts "DSOF" at ¶¶ 2-3)  Defendant was founded in 1973 and took its name from the final five letters of Caberlotto, the last name of the company's founder.  (*Id.* at ¶ 1)  Defendant asserts it has been world famous for decades, having been endorsed by famous athletes in the 1980s and having sponsored teams and athletes in professional tennis and national soccer clubs since the 1990s.  (*Id.* at ¶ 4)  Defendant offers its products on the internet as well as in retail stores, and says it uses <lottosport.com> as its primary domain name, which was registered in 1996.  (*Id.* at ¶ 6)  Defendant has been using the LOTTO WORKS mark internationally for more than ten years after it received registration for that mark in the European Union in August 2009.  (*Id.* at ¶¶ 7, 10)  On March 6, 2018, Defendant obtained registration of the trademark LOTTO WORKS with the United States Patent and Trademark Office ("USPTO") for

materials related to eyeglasses and clothing (shoes are included in the clothing category). (*Id.* at ¶ 9, Doc. 84-9 at 2)[3]  Defendant does not have trademark rights in the term "lotto" for gambling or lottery.  (Docs. 87 at ¶ 82, 90 at ¶ 82)

Shortly after Plaintiff purchased the disputed domain names in September and December 2016, Defendant initiated arbitration with WIPO.  (Doc. 84 at ¶¶ 11, 12, 20)  In a decision dated February 13, 2017, a WIPO sole panelist concluded that:   (1) the <lottoworks.com> domain name included the entire LOTTO WORKS mark so that the domain name was confusingly similar to that mark; (2) the <lottostore.com> domain name was also confusingly similar to Defendant's LOTTO trademark because the domain name incorporates "lotto" and only adds the generic[4] word "store," which "adds no distinctive element"; (3) Plaintiff registered the disputed domain names "to trade off the goodwill of [Defendant's] mark, which does not provide [Plaintiff] with any rights or legitimate interests"; and (4) the domain names were registered and used in bad faith.  (Doc. 85-1 at 5-8)  The WIPO panelist's finding of bad faith was premised on the understanding that Plaintiff had neglected to indicate he registered the domain names in 2016, not 1998,[5] the webpage for <lottoworks.com> displayed many references to shoes as well as links both to Defendant's and Defendant's competitors' websites, and because it was likely that internet users would visit the <lottostore.com> website intending to find Defendant's online store.  (*Id.* at 9)  The WIPO panelist did not find that Defendant's complaint was

---

[3] The DSOF incorrectly states that Defendant's application for the trademark of LOTTO WORKS was filed on October 26, 2018.  (Doc. 84 at ¶ 9)  In fact, Defendant applied for registration on October 27, 2016, and the trademark was registered by the USPTO on March 6, 2018.  (Doc. 84-9 at 2-3)

[4] A term is "generic" when consumers understand the word to refer to a good itself rather than to a particular producer's goods, that is, when the term "is identified with all such goods or services, regardless of their suppliers."  *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 604 (9th Cir. 2005).

[5] However, as is discussed below, the Ninth Circuit in *GoPets Ltd. v. Hise*, 657 F.3d 1024, 1032 (9th Cir. 2011) held that a re-registration of an existing domain name is not a "registration" for the purposes of the ACPA.

1    brought in bad faith or was primarily intended to harass the domain name holder and,

2    therefore, declined to grant Plaintiff's request that WIPO find that Defendant committed

3    reverse domain name hijacking.  (*Id.* at 9-10)

4         The parties now each cross move for summary judgment regarding Count One, in

5    which Plaintiff requests the Court to find Plaintiff's registration and use of the disputed

6    domain names are not unlawful pursuant to a claim of reverse domain name hijacking

7    under the ACPA provisions of the Lanham Act in 15 U.S.C. §§ 1114(2)(D)(v); and Count

8    Two, in which Plaintiff requests a declaration that Plaintiff's registration and use of the

9    disputed domains are not unlawful under the Lanham Act pursuant to 15 U.S.C. §

10   1125(d)(1).  (Docs. 83, 91, 95, 86, 89, 96)

11   **II.      STANDARD OF REVIEW**

12        "The court shall grant summary judgment if the movant shows that there is no

13   genuine dispute as to any material fact and the movant is entitled to judgment as a matter

14   of law."  Fed. R. Civ. P. 56(a).  "One of the principal purposes of the summary judgment

15   rule is to isolate and dispose of factually unsupported claims or defenses."  *Celotex Corp.*

16   *v. Catrett*, 477 U.S. 317, 323-24 (1986).  "[S]ubstantive law will identify which facts are

17   material. . . .  Only disputes over facts that might affect the outcome of the suit under the

18   governing law will properly preclude the entry of summary judgment."  *Anderson v.*

19   *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

20        "The proper question . . . is whether, viewing the facts in the non-moving party's

21   favor, summary judgment for the moving party is appropriate."  *Zetwick v. Cty. of Yolo*,

22   850 F.3d 436, 441 (9th Cir. 2017) (*citing Arizona ex rel. Horne v. Geo Group, Inc.*, 816

23   F.3d 1189, 1207 (9th Cir. 2016)).  "[W]here evidence is genuinely disputed on a particular

24   issue—such as by conflicting testimony—that 'issue is inappropriate for resolution on

25   summary judgment.'"  *Id.* (*quoting Direct Techs., LLC v. Elec. Arts, Inc.*, 836 F.3d 1059,

26   1067 (9th Cir. 2016)).

27        The movant bears the initial burden of proving the absence of a genuine issue of

28   material fact.  *Celotex*, 477 U.S. at 323.  For issues on which the movant would bear the

burden of proof at trial, the movant meets the initial summary judgment burden by identifying the evidence foreclosing the possibility that a reasonable jury could find for the non-movant. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157-58 (1970). Where the non-movant would bear the burden of proof at trial, the movant may carry its initial burden by proving the absence of evidence to support the non-movant's case. *Celotex*, 477 U.S. at 325. If the movant carries its initial burden, the non-movant must designate "significantly probative" evidence capable of supporting a favorable verdict. *Anderson*, 477 U.S. at 249-50.

In determining whether either or both of these burdens have been carried, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." *Id.* at 255; *see also Narayan v. EGL, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010) (explaining an inference is justifiable if it is rational or reasonable). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## III.   THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT

### A.   Plaintiff's Motion for Summary Judgment (Doc. 86)

Plaintiff contends he is entitled to summary judgment on his reverse domain name hijacking claim because his re-registration of the domain names is not treated as an initial registration, he did not use the domain names, and even if he did register or use the domain names after he purchased them, it was not with a bad faith intent to profit. (Doc. 86 at 11-20) He also argues that his actions fall within the safe harbor provisions of the ACPA because he had "reasonable grounds to believe that the use of the domain name was fair use or otherwise lawful." (*Id.* at 19-20, *citing* 15 U.S.C. § 1125(d)(1)(B)(ii)) Plaintiff further requests a declaration that his registration and use of the disputed domains are not unlawful under either the ACPA or other provisions of the Lanham Act. (Doc. 1 at 9-12, Doc. 86 at 11 (*citing* § 1125(d)(1))) Additionally, Plaintiff advises the Court he will file a

motion for attorneys' fees if he prevails on his motion for summary judgment.  (Doc. 86 at 20, Doc. 91 at 19)

## B.   Defendant's Motion for Summary Judgment (Doc. 83)

Defendant moves for summary judgment on Plaintiff's two claims.  (Doc. 83 at 5) Defendant argues that Plaintiff cannot show that his registration and use of the domain names did not violate the ACPA and did not violate the greater Lanham Act because such registration and use created a likelihood of confusion with Defendant's trademarks.  (*Id.* at 6)  Defendant also asserts that Plaintiff is not entitled to any attorneys' fees, and that Defendant instead should be awarded its fees.  (*Id.* at 22)

## IV.   CLAIM ONE – REVERSE DOMAIN NAME HIJACKING

## A.   Purpose and Elements of the Claim

The Fourth Circuit Court of Appeals explained ACPA's purpose and the policy concerns addressed by a claim of reverse domain name hijacking under the ACPA, as follows:

> In 1999, Congress amended the Trademark Act of 1946 (the Lanham Act) with the Anticybersquatting Consumer Protection Act (ACPA), Pub. L. No. 106–113, § 3001 *et seq.,* 113 Stat. 1501A–545 (codified in scattered sections of 15 U.S.C.), principally for the purpose of protecting trademark owners against cyberpiracy:
>
> > The purpose of the bill is to protect consumers and American businesses, to promote the growth of online commerce, and to provide clarity in the law for trademark owners by prohibiting the bad-faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from the goodwill associated with such marks—a practice commonly referred to as "cybersquatting."
>
> S. Rep. No. 106–140, at 4 (1999).  Although the ACPA was enacted primarily to redress cyberpiracy or "cybersquatting," it also provides limited liability for trademark infringement by registrars who participate in the administration of the registration, transfer, and cancellation of domain names pursuant to a "reasonable policy" that is consistent with the purposes of the trademark laws.  *See* 15 U.S.C. § 1114(2)(D)(i)-(iii).  And to balance the rights given to trademark owners against cybersquatters, the ACPA also

provides some protection to domain name registrants against "overreaching trademark owners." S. Rep. No. 106–140, at 11; *see also* 15 U.S.C. § 1114(2)(D)(iv)-(v). Thus, § 1114(2)(D)(v) authorizes a domain name registrant to sue trademark owners for "reverse domain name hijacking." Under that reverse domain name hijacking provision, a domain name registrant who is aggrieved by an overreaching trademark owner may commence an action to declare that the domain name registration or use by the registrant is not unlawful under the Lanham Act. This section provides that the court may "grant injunctive relief to the domain name registrant, including the reactivation of the domain name or transfer of the domain name to the domain name registrant." 15 U.S.C. § 1114(2)(D)(v).

*Barcelona.com, Inc. v. Excelentisimo Ayuntamiento De Barcelona*, 330 F.3d 617, 624-25 (4th Cir. 2003).

A claim of reverse domain name hijacking is based on the provisions of 15 U.S.C. § 1114(2)(D)(v), which provides:

(2) Notwithstanding any other provision of this chapter, the remedies given to the owner of a right infringed under this chapter or to a person bringing an action under section 1125(a) or (d) of this title shall be limited as follows: . . .

(D)(v) A domain name registrant whose domain name has been suspended, disabled, or transferred under a policy described under clause (ii)(II) may, upon notice to the mark owner, file a civil action to establish that the registration or use of the domain name by such registrant is not unlawful under this chapter. The court may grant injunctive relief to the domain name registrant, including the reactivation of the domain name or transfer of the domain name to the domain name registrant.

As District Judge Martone explained in a 2012 case with facts comparable to those at issue here, to prevail on a claim of reverse domain name hijacking, a plaintiff:

must show (1) registration of a domain name; (2) that has been "suspended, disabled, or transferred under a policy implemented by a registrar as described in 15 U.S.C. § 1114(2)(D)(ii)(II);" (3) "that the owner of the mark that prompted the domain name to be suspended, disabled, or transferred has notice of the action;" and (4) "that [the plaintiff's] registration or use of the domain name is not unlawful." *Ricks v. BMEzine.com, LLC*, 727 F. Supp. 2d 936, 959 (D. Nev. 2010) (citing *Barcelona.com, Inc. v. Excelentisimo*

1

2

*Ayuntamiento De Barcelona*, 330 F.3d 617, 625 & n. 1 (4th Cir. 2003)); *see also* 15 U.S.C. § 1114(2)(D)(v).

3

4

*AIRFX.com v. AirFX LLC*, No. CV 11-01064-PHX-FJM, 2012 WL 3638721, at *6 (D. Ariz. Aug. 24, 2012).

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

Here, the parties' dispute regarding the claim of reverse domain name hijacking under the ACPA centers on the first and fourth elements listed by Judge Martone, that is: (1) when the domain names were registered for purposes of the ACPA; and (2) whether such registration or use of the domain name was lawful.  *Id.*  Plaintiff asserts he did not unlawfully "register" the subject domain names, citing the holdings in *GoPets Ltd. v. Hise*, 657 F.3d 1024, 1032 (9th Cir. 2011) and *AIRFX*, 2012 WL 3638721, at *4. (Doc. 86 at 11-14)  He also contends that he has not used either of the disputed domains because they remain locked as a result of this proceeding and Defendant's Uniform Domain-Name Dispute-Resolution Policy ("UDRP") action adjudicated by WIPO, and because he has not derived any income from the domains or attempted to sell the domains to anyone, including Defendant.  (*Id.* at 13)  Plaintiff further argues that the evidence establishes no bad faith registration or use by him because he merely "pursued a lottery business and purchased names directly descriptive of that business[, n]othing more."  (*Id.* at 13-19)  Additionally, Plaintiff states that the ACPA safe harbor provision applies to his circumstances to exclude a finding of bad faith.  (*Id.* at 19-20, *citing* 15 U.S.C. § 1125(d)(1)(B)(ii))

20

21

22

23

Defendant urges that Plaintiff did in fact unlawfully register the two disputed domain names because he did so in bad faith.  (Doc. 83 at 18)  Defendant further argues that Plaintiff is unable to prove that his registration and use of the domain names were not unlawful.  (*Id.* at 16)

24

25

26

**B.**     **Whether Reference to "under this chapter" Refers to Only the ACPA or to the broader Lanham Act Regarding Reverse Domain Name Hijacking Statute**

27

28

Before addressing the disputed elements of Plaintiff's reverse domain name hijacking claim, the Court will consider a foundational disagreement between the parties

on the law applicable to this claim.  In its motion for summary judgment (Doc. 83 at 16-18), Defendant recognizes a split among courts on the scope of language within section 1114(2)(D)(v) of the ACPA, which provides that

> [a] domain name registrant whose domain name has been suspended, disabled, or transferred under a policy described under clause (ii)(II) may, upon notice to the mark owner, file a civil action to establish that the registration or use of the domain name by such registrant is not unlawful *under this chapter*.

15 U.S.C. § 1114(2)(D)(v) (emphasis added).  Defendant notes that the italicized phrase "under this chapter" has been interpreted by courts as either referring to the Lanham Act as a whole or limited specifically to the ACPA.  (Doc. 83 at 16)  Defendant concludes that Congress must have intended that § 1114(2)(D)(v) would refer to Title 15, Chapter 22 of the United States Code, entitled "Trademarks," because if Congress' intent was to limit the phrase "under this chapter" to only the ACPA, "it would not have used such expansive language."  (*Id.* at 16-17)  Defendant further argues that if the phrase "under this chapter" referred only to the ACPA, it would be "easier" to avoid the "hefty statutory damages if a registrant violates the ACPA" than if the registrant had to prove it did not "violate the much broader Lanham Act."  (*Id.* at 17)  Defendant opines that this interpretation of § 1142(2)(D)(v) "would require a court to grant equitable relief, in a case under a sub-chapter of the Lanham Act, to a party who violated the Lanham Act, as long as that party was careful enough to avoid violating one smaller sub-section of the Lanham Act."  (*Id.*)

Plaintiff counters that the phrase "under this chapter" is best understood to refer only to the ACPA.  (Doc. 96 at 13 (citing *Ricks v. BMEzine.com, LLC*, 727 F.Supp.2d 936, 959-960 (D. Nev. 2010)))  This Court concludes that Plaintiff espouses the better argument, which is described below.

In *Ricks v. BMEzine.com, LLC*, the district judge concluded that the phrase "under this chapter" means the ACPA, based on the legislative history and statutory construction of the ACPA. *Ricks*, 727 F.Supp.2d at 959-60.  The District of Nevada judge explained:

Although as codified the ACPA states the registrant must show its actions were not unlawful under "this chapter," the actual enactment states that the registrant must show its actions were not unlawful under "this Act."  Pub. L. No. 106–113, 1501A–555, 113 Stat. 21.  Courts have differed in describing whether the fourth requirement's reference to "Act" as originally enacted refers to the ACPA or the Lanham Act as a whole.  *See Storey v. Cello Holdings, L.L.C.,* 347 F.3d 370, 382 n. 9 (2d Cir. 2003) (noting issue but declining to decide it); *Barcelona.com, Inc.,* 330 F.3d at 628 n. 2 (stating, in dicta in a footnote, that "Act" is "defined to refer to the Trademark Act of 1946 (the Lanham Act)"); *Sallen v. Corinthians Licenciamentos LTDA,* 273 F.3d 14, 18 (1st Cir. 2001) (describing, without analysis, a reverse hijacking claim as one "for a declaration of nonviolation of the ACPA").

As stated above, statutory construction begins the statute's plain language. *Cooper*, 596 F.3d at 544.  If the statutory language is "plain and unambiguous," the Court's inquiry is at an end. *Id.*  The Court considers the statutory language in "the context of the statute as a whole." *Andreiu v. Ashcroft*, 253 F.3d 477, 480 (9th Cir. 2001).

The ACPA as enacted does not define what it means by reference to the term "Act."  However, it defines what it means when it is referring to the Lanham Act as a whole:

> Any reference in this title to the Trademark Act of 1946 shall be a reference to the Act entitled "An Act to provide for the registration and protection of trademarks used in commerce, to carry out the provisions of certain international conventions, and for other purposes", approved July 5, 1946 (15 U.S.C. 1051 et seq.).

Pub. L. No. 106–113, 113 Stat. 1501, 1501A–548.  The ACPA thus indicates that it is not referring to the entire Lanham Act unless it references the Trademark Act of 1946.  Contextually, the ACPA uses the term "Act" to refer to the ACPA, not the Lanham Act in its entirety.  For example, it states that it "shall apply to domain names registered on or after the date of the enactment of this Act." *Id.*; *see also* Pub. L. No. 106–113, 113 Stat 1501, 1501A–550 (giving Secretary of Commerce 180 days after enactment of "this Act" to conduct a study).  Indeed, the ACPA refers to the "Act" and the "Trademark Act of 1946" within the same section, confirming that in using the term "Act," the ACPA is referring to itself, not the Lanham Act as a whole:

1
2
3
4
5
6

> Sections 3002(a), 3003, 3004, 3005, and 3008 of this title shall apply to all domain names registered before, on, or after the date of the enactment of this Act, except that damages under subsection (a) or (d) of section 35 of the Trademark Act of 1946 (15 U.S.C. 1117), as amended by section 3003 of this title, shall not be available with respect to the registration, trafficking, or use of a domain name that occurs before the date of the enactment of this Act.

7
8
9
10

> Pub. L. No. 106–113, 113 Stat. 1501, 1501A–552. The Court therefore concludes that to satisfy the ACPA's requirement that a domain name registrant show that its conduct was not unlawful under "this Act," it must show its conduct was not unlawful under only the ACPA, not the entire Lanham Act.

11
12
13

*Id.* This Court finds the foregoing analysis persuasive. Accordingly, the Court will consider the issue of whether Plaintiff's registration or use of the disputed domain names is unlawful under the ACPA and not under the Lanham Act as a whole.

14

### C. Registration of the Disputed Domain Names

15
16
17
18

Plaintiff argues that his 2016 registration of the disputed domain names was not a registration as defined for claims of reverse domain name hijacking or otherwise under the ACPA. Rather, Plaintiff asserts he acquired the non-party original registrants' 1998 and 2011 domain name registrations when Plaintiff bought the domain names in 2016.

19
20
21
22
23
24
25
26
27
28

Plaintiff's argument relies on the Ninth Circuit's decision in *GoPets*, 657 F.3d 1024. In *GoPets*, defendant Edward Hise registered the domain name "gopets.com" in March 1999. *GoPets*, 657 F.3d at 1026. Hise developed a business plan directed at providing pet owner services. *Id.* at 1027. In 2004, a Korean company named GoPets Ltd. was founded and created a computer game called "GoPets." *Id.* GoPets Ltd. applied to register the service mark "GoPets" in the United States in September 2004, and the mark was registered in November 2006. *Id.* After GoPets Ltd. attempted without success to purchase the domain name from Hise, it filed a complaint with WIPO against Hise. *Id.* The WIPO arbitrator found in favor of Hise, explaining the gopets.com domain name was "confusingly similar to GoPets Ltd.'s service mark" and that "WIPO rules only

compel[led] the transfer or a disputed domain name if the name was initially registered in bad faith." *Id.* at 1027-28.  WIPO concluded that the initial registration could not have been in bad faith because it occurred five years before GoPets Ltd. was founded.  *Id.* at 1028.  After the WIPO decision, Hise transferred the registration of the gopets.com domain name to a corporation named Digital Overture, which Edward Hise owned with his brother. *Id.*

Among other issues, the Ninth Circuit addressed the question of whether the transfer of the domain name gopets.com from Hise to Digital Overture counted as "registration" pursuant to the ACPA.  The Ninth Circuit concluded that, "in light of traditional property law," there was "no basis in ACPA to conclude that a right that belongs to an initial registrant of a currently registered domain name is lost when that name is transferred to another owner," *Id.* at 1031, and held that:

> Digital Overture's re-registration of gopets.com was not a registration within the meaning of § 1125(d)(1).  Because Edward Hise registered the domain name gopets.com in 1999, long before GoPets Ltd. registered its service mark, Digital Overture's re-registration and continued ownership of gopets.com does not violate § 1125(d)(1).

*Id.* at 1032.  This holding has been applied in favor of Plaintiff's position in this action.

In *AIRFX.com*, District Judge Martone addressed a case in which a non-party registered the domain name "airfx.com" in 2003.  *AIRFX.com*, 2012 WL 3638721 at *2. The parent company of the defendant AIRFX LLC filed a trademark application for "AIRFX" in 2005, identifying June 2005 as the date of first use in commerce.  *Id.*  The defendant's parent company assigned the trademark registration to the defendant in 2011. *Id.*  The defendant used the trademark "in connection with shock absorbers and suspension systems for motorcycles, bicycles, automobiles, and powered vehicles."  *Id.*  In 2007, the plaintiff purchased the domain name "airfx.com" from the non-party and decided to use airfx.com and the brand "AIRFX" in his wind tunnel business.  *Id.*

Similar to the case before this Court, (1) the *AIRFX.com* plaintiff had "not posted any content at the www.airfx.com domain name, and ha[d] not created a website for

airfx.com"; (2) the domain name was parked at a "splash page"[6] provided by GoDaddy, the domain name registrar; (3) the splash page included third-party advertisements; and (4) the plaintiff did not derive any revenue from the advertisements placed by GoDaddy on the splash page.  *Id.*  Further, the plaintiff had never sold a product using the AIRFX brand and had not engaged in any manufacturing, marketing, or advertising for that brand.  *Id.*  After the defendant offered to purchase the disputed domain name and the plaintiff unsuccessfully counter-offered to lease the name, the defendant filed a domain name dispute.  *Id.*  The arbitration panel found for the defendant and ordered GoDaddy to transfer the domain name to the defendant.  *Id.*  The plaintiff then filed a claim for reverse domain name hijacking in the U.S. District Court, and the defendant counterclaimed on counts of trademark infringement and cybersquatting under the ACPA.  *Id.* at *3.[7]

District Judge Martone applied *GoPets* as "squarely on point."  *Id.* at *4.  Judge Martone found that the plaintiff's re-registration of the purchased domain name from an unrelated third party was not "registration" within the meaning of the ACPA and that the plaintiff had not put the domain names to "commercial use."  *Id.*  Accordingly, Judge Martone granted summary judgment in plaintiff's favor on plaintiff's reverse domain name hijacking claim and on defendant's cybersquatting counterclaim.  *Id.*

Here, the domain name <lottoworks.com> was initially registered by a non-party in July 1998.  (Docs. 87 at ¶ 99, 90 at ¶ 99)  Defendant did not use the LOTTO WORKS mark until approximately 2007 and obtained trademark registration for the term in the EU in August 2009.   (Doc. 84-1 at ¶ 9)   The domain name <lottostore.com> was initially registered by a non-party in January 2011.  (Docs. 87 at ¶ 100, 90 at ¶ 100)  There is no claim that Defendant used or registered <lottostore.com> at any time.[8]  Applying the Ninth

---

[6] The court explained that "[a] 'splash page' is the first page that appears when a website is visited."  *AIRFX.com*, 2012 WL 3638721 at *2 n.2 (*citing Chambers v. Time Warner*, 2003 WL 749422 at *7 (S.D.N.Y. Mar. 5, 2003)).

[7] In this action, Defendant has not counterclaimed.

[8] Defendant asserts that its "primary domain name is <lottosport.com>, which it registered

Circuit's reasoning in *GoPets* to the facts here, Plaintiff's re-registration of the disputed domain names in 2016 is not registration for purposes of § 1125(d)(1). The Court concludes that Plaintiff did not register the disputed domain names of <lottostore.com> and <lottoworks.com> within the meaning of § 1125(d)(1) when Plaintiff acquired the disputed domain names in 2016. Instead, the prior 1998 and 2011 registrations conveyed to Plaintiff when he acquired these domain names. *GoPets*, 657 F.3d at 1031-32. Given that there is no allegation that the non-party registrations in 1998 and 2011 were unlawful or in bad faith, Plaintiff has shown that its registrations of <lottostore.com> and <lottoworks.com> were not unlawful and were not in bad faith. Thus, if Plaintiff did not use the domain names at all, or if Plaintiff's use of the domain names was lawful and not in bad faith, Plaintiff is entitled to summary judgment on Count One regarding reverse domain name hijacking.

### D.   Use of the Disputed Domain Names

Plaintiff asserts he has not used either of the two disputed domain names because: (1) the domain <lottostore.com> was parked when Plaintiff purchased it in September 2016, domain <lottoworks.com> was similarly parked when Plaintiff purchased it in December 2016, and both domain names subsequently have remained parked; (2) the parking sites did not enable "cash parking," and Plaintiff derived no revenue from the sites; (3) Plaintiff did not control the content displayed on the parking pages, which was instead under the control of GoDaddy; and (4) Plaintiff did not attempt to sell the domain names to Defendant or anyone else. (Doc. 86 at 13) Plaintiff asserts that Defendant has provided no evidence supporting a finding of Plaintiff's use of the domain names. Plaintiff further contends that use of the disputed domains, if any, must be in connection with "commercial use" of the domains, and that such use is not present here. (Doc. 86 at 17-18)[9]

---

in 1996" and that it "owns numerous other domains, including <lottoworks.net>, which it registered in 2004." (Doc. 84 at ¶ 6)

[9] Plaintiff is mistaken regarding a requirement of *commercial* use. The Ninth Circuit has concluded that respecting a claim under the ACPA, unlike the greater Lanham Act, there is no requirement that use be commercial use because "the rights created in the ACPA are

1    Defendant asserts that Plaintiff used the marks in commerce, stating that GoDaddy's

2    parking pages "provided a solicitation to visitors to purchase the domain name and

3    contained links which led to paid advertisements for [Defendant's] competitors."  (Doc. 95

4    at 5)    However, this Court concludes that Defendant misstates evidence regarding

5    Plaintiff's control over the content of GoDaddy's parking page.  Attached as an exhibit to

6    Defendant's motion to dismiss (Doc. 11) is GoDaddy's Domain Name Registration

7    Agreement, effective July 11, 2017.  (Doc. 11-19 at 2-27)  Section 10 of this agreement

8    governs control over GoDaddy's parked pages.  (*Id.* at 14-15)  The parked page is a default

9    setting over which GoDaddy has control.  (*Id.* at 15)  Under the agreement, the owner of a

10   parked domain name agrees that "GoDaddy may display both (a) in-house advertising

11   (which includes links to GoDaddy products and services) and (b) third-party advertising

12   (which includes links to third-party products and services) on your Parked Page[.]"  (*Id.*)

13   The agreement provides that the domain owner will "acknowledge and agree that all in-

14   house and third-party advertising will be selected by GoDaddy and its advertising partners,

15   as appropriate, and you will not be permitted to customize the advertising, or entitled to

16   any compensation in exchange therefor."  (*Id.*)  The agreement further provides that the

17   domain name owner is not permitted to "modify the content displaying on your Parked

18   Page[,]" but is allowed to change the parked page default settings at any time, limited to:

19   participation in a cash parking service to earn money on the posted content, or the ability

20   to "contact customer support to learn what other options might be available. . . ."  (*Id.*)  *See*

21   *also Academy of Motion Picture Arts & Sciences v. GoDaddy.com, Inc.*, CV 10-03738,

22   2015 WL 12684340, at *3 (C.D. Cal. Apr. 10, 2015) (describing GoDaddy's domain name

23   parking options of free parking and cash parking).

24   Defendant cites to no case authority discussing or holding that a domain name

25   owner's utilization of a GoDaddy or a similar noncash parking page constitutes "use" of

26   the domain name in the context of a claim under the ACPA.  Further, the evidence indicates

27
28   distinct from the rights contained in other sections of the Lanham Act, and do not stem
     from the common law of trademarks."  *Petroliam Nasional Berhad v. GoDaddy.com, Inc.*,
     737 F.3d 546, 552-53 (9th Cir. 2013).

that:  (1) Plaintiff has not developed a public website using the domains; (2) Plaintiff has not advertised or sold any goods or services using the domains; and (3) under his agreements with GoDaddy, Plaintiff has no authority to modify the content on the parked pages and may only inquire of customer support what further options "might be available." To the extent evidence supports a conclusion that Plaintiff requested GoDaddy to alter the content of the domain name parking pages, this does not establish either that Plaintiff had control over the content of the parking pages or even that a disputed issue of fact exists regarding whether Plaintiff had control.  Under the agreement, GoDaddy had control, not Plaintiff.  Thus, as a matter of law applied to the material undisputed facts before the Court, the Court finds that Plaintiff has not used the domain names.

### E.    Bad Faith & Safe Harbor

Plaintiff recognizes that a claim under the ACPA requires a finding that any registration and any use of a disputed domain name was not done in bad faith.  *See* 15 U.S.C. § 1125(d)(1).  (Doc. 86 at 14)  Given that the Court has found that Plaintiff purchased the 1998 and 2011 non-party registrations of the disputed domain names, given that there is no evidence of unlawful use or bad faith regarding such registrations, and given that the Court has found that Plaintiff did not use the disputed domain names, the Court need not address bad faith and safe harbor provisions of the ACPA.  Thus, the parties' dispute about application of bad faith factors under the ACPA does not prevent summary judgment for Plaintiff on Plaintiff's reverse domain name hijacking claim in Count One.

Nevertheless, applying the undisputed material facts before the Court, Plaintiff qualifies for the safe harbor under the ACPA:  "Bad faith 'shall not be found in any case in which the court determines that the person believed and had a reasonable grounds to believe that the use of the domain name was fair use or otherwise lawful.'  15 U.S.C. § 1125(d)(1)(B)(ii)."  *Interstellar Starship Servs. Ltd. v. Epix, Inc.,* 304 F.3d 936, 947 (9th Cir. 2002). [10]

---

[10] Also noteworthy is that federal courts:

> have  identified  two  "quintessential  example[s]"  of  bad  faith:  where  a

Defendant contends that Plaintiff failed to conduct a reasonable investigation before acquiring the domain names and that such failure prevents Plaintiff from seeking protection under the ACPA's safe harbor provision.  (Doc. 83 at 13, *citing NextEngine Ventures, LLC v. Lastar, Inc.*, No. CV 13-0463-TJH (JPRx), 2014 WL 6944877 at \*4 (C.D. Cal. Dec. 8, 2014); Doc. 89 at 12-13 (same))  Defendant states that Plaintiff admitted performing no investigation into whether the disputed domain names might infringe intellectual property rights before acquiring the domain names, citing *NextEngine*, 2014 WL 12581777 at \*10. (Doc. 83 at 14, Doc. 89 at 12-16, Doc. 95 at 11-12)

Plaintiff counters that even if he were found to have used the domain names, such use could not have been in bad faith because he believed and still believes his intended use of the marks is lawful; thus, he claims he is entitled to the protection of the ACPA's safe harbor provision in 15 U.S.C. § 1125(d)(1)(B)(ii).  (Doc. 86 at 19)  Plaintiff argues that because the domain names are generic or descriptive[11] regarding gambling and lottery

---

defendant "purchases a domain name very similar to the trademark and then offers to sell the name to the trademark owner at an extortionate price," and where a defendant "intend[s] to profit by diverting customers from the website of the trademark owner to the defendant's own website, where those consumers would purchase the defendant's products or services instead of the trademark owner's."  *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1058 (10th Cir. 2008); *see also Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 549 (6th Cir. 2003) ("Registering a famous trademark as a domain name and then offering it for sale to the trademark owner is exactly the wrong Congress intended to remedy when it passed the ACPA."). In those situations, the case for bad faith is at its peak.

*Gioconda Law Group PLLC v. Kenzie*, 941 F.Supp.2d 424, 434-35 (S.D.N.Y. 2013).  There is no evidence in this action that would support a finding of either of these two "quintessential examples of bad faith."

[11] "Descriptive marks define qualities or characteristics of a product in a straightforward way the requires no exercise of the imagination to be understood."  *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1141-42 (9th Cir. 2002) (citation and internal quotation marks omitted).

activities without secondary meaning[12], it would be reasonable to conduct no investigation. (Doc. 91 at 10)  Indeed, dictionary definitions of "lotto" from 1986 and from the present both confirm Plaintiff's position.  *See Webster's Ninth New Collegiate Dictionary* 706 (1986) (defining the term "lotto" as having a single meaning, i.e., "a game of chance resembling bingo."); *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/lotto.  Accessed 24 Feb. 2020 (same).

Plaintiff further argues that the facts presented here are significantly different from *NextEngine,* the only case Defendant cites in support of its argument.  (Doc. 91 at 11)  Plaintiff avers that the domain name at issue in *NextEngine* was not clearly generic or descriptive and was purchased by an entity in the business of acquiring internet domain names to use for investment purposes and "to direct internet users to its other commercial sites."  (*Id.*)  Plaintiff further asserts that Defendant misconstrues Plaintiff's expert's deposition, and further explains that Plaintiff consulted with counsel on trademark issues as a part of the purchase of the disputed domains.  (*Id.* at 11-12)  Moreover, Plaintiff avers that he used an escrow service to obtain the domain names.  (Doc. 91 at 12, Doc. 91-1 at 6, Doc. 88 at ¶¶ 198, 199, Doc. 87-1 at ¶199)  Plaintiff's arguments are well-taken and supported by the record.

In addition, the evidence is undisputed that Plaintiff was not aware of Defendant when he acquired the disputed domains.  (Doc. 87 at ¶ 79)[13]  Also undisputed is that Plaintiff believed at the time he acquired the disputed domains and thereafter that his

---

[12] "Secondary meaning" refers to the consumer's association between the mark and a particular source.  *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292 (9th Cir. 1992).  A merely descriptive trademark must be identified with a single commercial source to be entitled to trademark protection. 2 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 15:1 (5th ed. 2018).

[13] Defendant attempts to dispute this fact by asserting that Plaintiff's statement is not plausible because "Lotto is a world-renowned brand mark, particularly throughout Europe" (Doc. 90 at ¶ 79), but Defendant's assertion is not sufficient to create a disputed material issue of fact.  Further, Defendant's position is rejected by this Court as unpersuasive argument.

intended use for the disputed domain names was fair use or otherwise lawful.  There are reasonable legal grounds for Plaintiff's belief.  The term "lotto" is a generic lottery term. Gambling is a market sector that Defendant does not serve but is a market sector in which Plaintiff has had longstanding involvement and in which Plaintiff intended to use the disputed domains.[14]  Further, there is no evidence that Plaintiff has or had control over the content placed on the disputed domain names' parking pages, or that his intent was to divert consumers for commercial gain.  Similarly, there is no evidence that Plaintiff has affirmatively offered to sell the domain names.  On the evidence presented it is undisputed that Plaintiff believed and had reasonable grounds to believe that his use of the disputed domain names was fair use or otherwise lawful.  Plaintiff is entitled to protection under the safe harbor provisions of 15 U.S.C. § 1125(d)(1)(B)(ii).

### F.   Summary

For the reasons set forth above, the Court concludes as a matter of law applied to undisputed facts that Plaintiff did not unlawfully register or use at all, let alone unlawfully use, the disputed domain names.  Further, Plaintiff is entitled to the ACPA's safe harbor protection regarding any registration and use of the disputed domain names.  Accordingly, Plaintiff's motion for summary judgment on his Count One reverse domain name hijacking claim will be granted and Defendant's motion for summary judgment regarding the same claim will be denied.

. . .

. . .

. . .

---

[14] *See Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.*, 601 F.2d 1011, 1014-18 (9th Cir. 1979) (affirming district court decision that the coined word "surgicenter" from the generic words "surgery center" was also generic.)  In *Surgicenters*, the Ninth Circuit cited *Abercrombie & Fitch* for its recognition that "a word may be in one category for a particular product, and in quite a different one for another, noting, for example, that 'ivory' would be 'generic when used to describe a product made from the tusks of elephants but arbitrary as applied to soap.'"  *Surgicenters*, 601 F.2d at 1019 (quoting *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 n.6 (2d Cir. 1976)).

1
2

## V.   CLAIM TWO - PLAINTIFF'S REQUEST FOR A DECLARATION PURSUANT TO 28 U.S.C. § 2201

3

4

Plaintiff requests a declaration pursuant to 28 U.S.C. § 2201 that Plaintiff did not

5

violate the Lanham Act.  (Doc. 1 at 10-12)  He asserts that, absent a "declaration from the

6

Court, GoDaddy LLC will transfer the [d]omain [n]ames to the control of the Defendant,

7

and Plaintiff will suffer immediate and irreparable harm."  (*Id.* at 11)

8

Section 43(a) of the Lanham Act provides that a person is liable for trademark

9

infringement if he:

10

> uses in commerce any word, term, name, symbol, or device, or any
> combination thereof, or any false designation of origin, false or misleading
> description of fact, or false or misleading representation of fact, which . . . is
> likely to cause confusion, or to cause mistake, or to deceive as to the
> affiliation, connection, or association of such person with another person, or
> as to the origin, sponsorship, or approval of his or her goods, services, or
> commercial activities by another person[.]

11

12

13

14

15 U.S.C. § 1125(a)(1)(A).

15

### A.   Plaintiff Has Not Used the Disputed Domain Names in Commerce

16

Trademark infringement under the Lanham Act requires, as a threshold issue, "use

17

in commerce."  15 U.S.C. § 1125(a)(1)(A).  Additionally, 15 U.S.C. § 1114(1)(a) prohibits

18

a person, without the permission of the registrant, to "use in commerce any . . . colorable

19

imitation of a registered mark in connection with the sale, offering for sale, distribution, or

20

advertising of any goods or services on or in connection with which such use is likely to

21

cause confusion, or to cause mistake, or to deceive[.]"  15 U.S.C. § 1114(1)(a).

22

The Ninth Circuit has instructed that trademark infringement claims "are subject to

23

a commercial use requirement."  *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 676 (9th

24

Cir. 2005) (*quoting* 15 U.S.C. § 1141(1)(a)).   The Ninth Circuit explained that a

25

commercial use requirement for an infringement claim protects against confusion in

26

mistaken purchasing decisions rather than against confusion generally.  *Id.* at 677 (*citing*

27

*Lang v. Ret. Living Publ'g Co., Inc.*, 949 F.2d 576, 582-83 (2d Cir. 1991)).  A party's

28

commercial use is properly determined by assessing whether the use was "in connection

with a sale of goods or services." *Id.*  Moreover, a "mere registration of a domain name [is] not sufficient to constitute commercial use for purposes of the Lanham Act." *Brookfield Communc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1052 (9th Cir. 1999).

Defendant contends that Plaintiff used the disputed domain names in commerce when Plaintiff parked the domain names on GoDaddy's pages, on which GoDaddy placed links leading to paid advertisements for Defendant's competitors and solicited visitors to purchase the domains.  (Doc. 95 at 5)  For the reasons discussed above in Section IV, however, this Court concludes that Plaintiff has not put the disputed domain names to "commercial use."  As the Ninth Circuit stated in *Bosley*, commercial use has been interpreted "to be roughly analogous to the 'in connection with' sale of goods and services requirement of the infringement statute."  *Bosley*, 403 F.3d at 676.  Given that the domain names have remained parked since before Plaintiff acquired them, Plaintiff has not marketed or sold any goods or services in connection with the domains, and GoDaddy, not Plaintiff, controls the parked pages' contents, it cannot reasonably be concluded that Plaintiff has used the domains in commerce.

Because Plaintiff has not used the disputed domain names in commerce, Plaintiff has not violated the Lanham Act as a matter of law.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment will be granted and Defendant's motion for summary judgment will be denied.  Pursuant to 15 U.S.C. § 1114(2)(D), this Court "may grant injunctive relief to the domain name registrant, including the reactivation of the domain name or transfer of the domain name to the domain name registrant."  The Court will order that the disputed domain names <lottostore.com> and <lottoworks.com> remain registered with the Plaintiff and be unlocked/reactivated for Plaintiff's lawful use.

. . .

. . .

Plaintiff advises the Court he will file a motion for attorneys' fees.  (Doc. 1 at 20, Doc. 91 at 19)  The Court will rule on such a motion if and when it is filed and becomes ripe for decision.

Accordingly,

**THE COURT FINDS** that Plaintiff's registration and use to date of the domain names <lottostore.com> and <lottoworks.com> are not unlawful under the ACPA or the Lanham Act.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 86) is **granted** and Defendant Lotto Sport Italia, S.P.A.'s Motion for Summary Judgment (Doc. 83) is **denied**.

**IT IS FURTHER ORDERED** that the domain names <lottostore.com> and <lottoworks.com> shall not be transferred to Defendant but instead shall remain registered with the Plaintiff; <lottostore.com> and <lottoworks.com> shall be unlocked/reactivated for Plaintiff's lawful use.

**IT IS FURTHER ORDERED** directing the Clerk of Court to enter judgment in favor of Plaintiff on Plaintiff's reverse domain name hijacking claim in Count One and Plaintiff's declaratory relief claim in Count Two.

Dated this 10th day of March, 2020.

Honorable Deborah M. Fine
United States Magistrate Judge