1    WO

6                   **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

9    David Dent,                              No.  CV-17-00651-PHX-DMF

10                    Plaintiff,

11   v.                                       **ORDER**

12   Lotto Sport Italia SpA,

13                    Defendant.

          Pending before the Court is Plaintiff David Dent's ("Plaintiff") Motion for Attorneys' Fees pursuant to 15 U.S.C. § 1117(a) and Rule 54(d)(2) of the Federal Rules of Civil Procedure.  (Doc. 115 at 4, 5)[1]  Defendant Lotto Sport Italia, SpA ("Defendant") filed a response in opposition (Doc. 116) and Plaintiff filed a reply (Doc. 117).  For the reasons set forth below, the Court will grant Plaintiff's motion.

**I.    BACKGROUND**

          In 2016, Plaintiff purchased the domain names <lottostore.com> and <lottoworks.com> in support of his planned entry into the secondary lottery industry.  (Doc. 97 at 2-3)  The domain name <lottostore.com> was first registered by a third party in January 2011.  (*Id.* at 3)  The domain name <lottoworks.com> was originally registered by a separate third party in 1998.  (*Id.*)  Defendant[2], a global company producing and

---

[1] Citations to the record indicate documents as displayed in the official electronic document filing system maintained by the District of Arizona under Case Number CV-17-00651-PHX-DMF.

[2] Defendant was founded in 1973 and took its name from the final five letters of Caberlotto, the last name of the company's founder.

selling athletic footwear, sportswear, and sports accessories, received registration of the trademark LOTTO WORKS in the European Union in 2009.  (*Id.*)  Defendant obtained registration of this trademark in the United States in 2018 for use in connection with materials related to eyeglasses and clothing, including shoes.  (*Id.* at 3-4)  Defendant does not have trademark rights in the term "lotto" for gambling or lottery.  (*Id.* at 4)

Shortly after Plaintiff purchased the disputed domain names in  2016, Defendant initiated arbitration with the World Intellectual Property Organization ("WIPO") regarding the use of domain name <lottoworks.com> causing the registrar GoDaddy to lock this domain name.  (*Id.* at 3)  The WIPO panelist ruled in Defendant's favor and ordered that the disputed domain names be transferred from Plaintiff to Defendant.  (Doc. 85-1 at 10) However, the WIPO panelist's decision is not accorded deference on the merits in federal court.  *Barcelona.com, Inc. v. Excelentisimo Ayuntamiento De Barcelona*, 330 F.3d 617, (4th Cir. 2003); *Sallen v. Corinthians Licenciamentos LTDA*, 273 F.3d 14, 26 (1st Cir. 2001) (citing April 1999 WIPO report "stating the UDRP administrative dispute resolution procedures 'should not have (and cannot have) the effect of binding precedent in national courts.'").

Plaintiff initially filed a complaint in this Court alleging three counts encompassing five claims for relief.  (Doc. 1)  Count One requested a finding that Plaintiff's registration and/or use of the domain names <lottostore.com> and <lottoworks.com> was not unlawful pursuant to a claim of reverse domain name hijacking ("RDNH") under the Anticybersquatting Consumer Protection Act ("ACPA") provisions of the Lanham Act in 15 U.S.C. §§ 1114(2)(D)(v)[3].  (*Id.* at 9-10)  Count Two requested declaratory relief that Plaintiff's registration and/or use of the two domain names <lottostore.com> and <lottoworks.com> did not violate Defendant's rights under the Lanham Act.  (*Id.* at 10-12 (citing 15 U.S.C. § 1125(d)(1)))  Count Three alleged tortious interference and was

---

[3] Plaintiff's Count One originally alleged violation of both § 1114(2)(D)(iv) and § 1142(2)(D)(v).  (Doc. 1 at 9-10)  District Judge Silver found that § 1114(2)(D)(iv) and § 1114(2)(D)(v) define separate violations and that only § 1114(2)(D)(v) addressed reverse domain name hijacking.  (Doc. 17 at 4)  Judge Silver concluded that Plaintiff had failed to state a claim under § 1114(2)(D)(iv) for fraud in a domain dispute proceeding and dismissed without prejudice any claim under that subsection.  (*Id.*)

1    dismissed without prejudice with leave to amend if deficiencies in the claim were cured.

2    (Docs. 1, 17)  Plaintiff did not amend his complaint.  Plaintiff also requested statutory

3    damages under 15 U.S.C. § 1117(d) (Doc. 1 at 13), but he did not argue for such damages

4    in his motion for summary judgment.  (Docs. 86-91)

5         The parties filed cross-motions for summary judgment on Counts One and Two.

6    (Docs. 83, 91, 95, 86, 89, 96)  This Court granted Plaintiff's motion for summary judgment

7    and denied Defendant's motion for summary judgment on both counts, found Plaintiff's

8    registration and use of the domain names were not unlawful under the ACPA or the

9    Lanham Act, ordered that the domain names remain registered with Plaintiff, and further

10   ordered that the domains be unlocked or reactivated for Plaintiff's lawful use.  (Doc. 97 at

11   23)

12   **II.    LEGAL STANDARD**

13        Pursuant to the "American Rule," a litigant's "attorney's fees are not ordinarily

14   recoverable in the absence of a statute or enforceable contract providing therefor."

15   *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 717 (1967).  The

16   American Rule addresses concerns that "one should not be penalized for merely defending

17   or prosecuting a lawsuit," and that persons of modest means "might be unjustly

18   discouraged from instituting actions to vindicate their rights if the penalty for losing

19   included the fees of their opponents' counsel."  *Id.* at 718.  The Supreme Court further

20   recognized that "litigating the question of what constitutes reasonable attorney's fees

21   would pose substantial burdens for judicial administration."  *Id.*

22        The Lanham Act permits an award of attorneys' fees to the prevailing party in

23   "exceptional cases."  15 U.S.C. § 1117(a).  In *Octane Fitness*, the United States Supreme

24   Court reviewed Section 285 of the Patent Act, providing that "[t]he court in exceptional

25   cases may award reasonable attorney fees to the prevailing party."  *Octane Fitness, LLC*

26   *v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553-54 (2014) (citing 35 U.S.C. § 285).

27   The Supreme Court held "that an 'exceptional' case is simply one that stands out from

28   others with respect to the substantive strength of a party's litigating position (considering

both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Id.* at 554.  The Court concluded that a decision on whether to award attorney fees was not formulaic and that a district court should perform a case-by-case assessment, considering the totality of the circumstances.  *Id.*  The Supreme Court also instructed that the applicable burden of proof to establish entitlement to attorney fees in patent litigation is a preponderance of the evidence standard, which "allows both parties to share the risk of error in roughly equal fashion."  *Id.* at 557-58 (citation and quotation marks omitted).  The Court cited *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994) for a "nonexclusive list of factors" a court could consider, including "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."  *Id.* at 554 n.6 (internal quotation marks omitted).

Prior to the Supreme Court's decision in *Octane*, the Ninth Circuit had instructed that under the Lanham Act, cases were exceptional where a plaintiff's case is groundless, unreasonable, vexatious, or pursued in bad faith, and where the plaintiff has no reasonable or legal basis to believe in success on the merits.  *See Secalt S.A. v. Wuxi Shenxi Constr. Mach. Co.*, 668 F.3d 677, 683 (9th Cir. 2012), *abrogated by SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179 (9th Cir. 2016) (en banc).  Subsequently, the Ninth Circuit explained that the Supreme Court in "*Octane Fitness* and *Highmark*[*Inc. v. Allcare Health Mgmt. Sys., Inc.,* 572 U.S. 559 (2014)] have altered the analysis of fee applications under the Lanham Act."  *SunEarth*, 839 F.3d at 1180-81.  Although *Octane* addressed attorney fees provisions in the Patent Act and *SunEarth* considered attorney fees provisions under the Lanham Act, the "fee-shifting provisions in both acts are parallel and identical" and courts "rely on an interpretation of the fee-shifting provision in one Act to guide our interpretation of the parallel provision in the other."  *Id.* at 1180 (citation and internal quotation marks omitted).  The Ninth Circuit indicated that district courts should exercise equitable discretion and consider the nonexclusive *Fogerty* factors.  *Id.* (quoting *Octane Fitness, LLC*, 572 U.S. at 1756 n.6).

1    **III.    DISCUSSION**

2        **A.    The Parties' Arguments**

3            ***1.    Plaintiff's arguments***

4        Plaintiff argues this case qualifies as "exceptional" under the *Octane* standard

5    because the facts presented here and in *AirFX* are closely similar and the District of Arizona

6    in *AirFX* found that case was exceptional and awarded fees even under the stricter, pre-

7    *Octane* standard.  (Doc. 115 at 7, citing *AirFX.com v. AirFX, LLC*, No. CV 11-01064-PHX-

8    FJM, 2013 WL 857976, at *1 (D. Ariz. Mar. 7, 2013) (citations and internal quotation

9    marks omitted)).  Plaintiff further contends that Defendant's arguments were objectively

10   unreasonable.  (*Id.* at 10-19)  Moreover, Plaintiff asserts that applying the post-*Octane*

11   standard of a preponderance of the evidence rather than the pre-*Octane* clear and

12   convincing standard used by the *AirFX* court to decide essentially identical facts as those

13   presented here should result in this Court's finding that this case is exceptional.  (*Id.* at 9-

14   10)

15       Plaintiff states that Defendant was aware prior to filing its WIPO complaint that the

16   domain name <lottoworks.com> was first registered on July 30, 1998, and that the domain

17   name <lottostore.com> was first registered on January 4, 2011, each well before Plaintiff

18   acquired the domains and before Defendant's use of its trademarks, and that pursuant to

19   the Ninth Circuit's holding in *GoPets Ltd. v. Hise*, 657 F.3d 1024 (9th Cir. 2011) the

20   registration of the disputed domain names predated Defendant's use of its trademarks.  (*Id.*

21   at 11, citing Doc. 11-1 at 5-6)  Plaintiff notes that Defendant's trial counsel in this matter,

22   Marc John Randazza, served as counsel for the prevailing plaintiff in *AirFX* and had

23   successfully relied on the Ninth Circuit's decision in *GoPets* for the proposition that "the

24   rights of an initial registrant are passed to the next registrant upon transfer of a domain

25   name."  (*Id.* at 11, citing *AIRFX.com et al. v. AirFX LLC*, No. 2:11-cv-01064-FJM, Doc.

26   65 at 6 (D. Ariz. Jan. 26, 2012)).[4]

---

27   [4] The docket in *AirFX* also indicates that Mr. Randazza cited *GoPets* in support of the
     plaintiff's argument that the defendant's counterclaim asserting the plaintiff violated the
28   ACPA failed as a matter of law.  *AIRFX.com et al. v. AirFX LLC*, No. 2:11-cv-01064-FJM,
     Doc. 33 at 4-7 (D. Ariz. Nov. 22, 2011).

1     Plaintiff enumerates additional instances where he alleges Defendant's positions in

2  this case were inconsistent with facts in the record, which Plaintiff argues Defendant knew

3  or could readily have discovered, including:  (1) Defendant's argument that Plaintiff had

4  placed advertising on at least one of the disputed domains; (2) Defendant's attributing to

5  Plaintiff information on the previous owner's parking pages associated with

6  <lottostore.com>; (3) Defendant's assertion that Plaintiff had placed the disputed domain

7  names for sale; (4) Defendant's failure to recognize that the disputed domains were locked

8  and that Plaintiff never profited from the domains, which was relevant to an element of

9  Defendant's allegations of cybersquatting; and (5) Defendant's failure to recognize

10  Plaintiff's involvement with a large number of domain names associated with gambling-

11  related endeavors.  (*Id.* at 12-17)  Plaintiff asserts that Defendant was aware that its case

12  lacked merit but proceeded anyway.   (*Id.* at 18)    Plaintiff also characterizes the

13  circumstances of this litigation as involving Defendant in the position of a large corporation

14  with "deep pockets and a large litigation budget" forcing Plaintiff, a small business owner,

15  to choose "between losing hundreds of thousands of dollars (even if they win) to keep their

16  property, or surrendering" because of the imbalance in resources.  (*Id.* at 18-19)

17                    **2.      *Defendant's arguments***

18     Defendant notes that Plaintiff did not prevail on all his claims and indicates that

19  Plaintiff's claims of fraud and tortious interference asserted in his complaint were

20  dismissed for failure to state a claim based on Defendant's motion.  (Doc. 116 at 7)[5]

21  Defendant also indicates that Plaintiff did not assert his statutory damages claim on

22  summary judgment. (Doc. 116 at 12)  Defendant argues that its positions on these claims

23  were not merely debatable but successful and are evidence of its reasonableness in

24  continuing to litigate.  (*Id.*)

25     Defendant further declares that its decision to defend against Plaintiff's claims was

26  not baseless and points to the fact that it held valid trademarks, which it concludes supports

27

28  _____
[5]  The Court dismissed both Plaintiff's potential claim for fraud under 15 U.S.C. § 1114(2)(D)(iv) and his claim for tortious interference with leave to amend.  (Doc. 17)  Plaintiff did not file an amended complaint.

the conclusion that its defense was not frivolous.  (*Id.* at 9-10).  Defendant further argues that it had prevailed in arbitration and this success supports its decision to defend Plaintiff's claims in this Court.  (*Id.* at 10)  Defendant asserts the issues it raised were debatable.  (*Id.* at 11)

Defendant also notes that its arguments on summary judgment were directed to the meaning of the phrase "under this chapter" and whether the phrase referred to the Lanham Act as a whole or instead was limited to the ACPA.  (*Id.* at 12-13)  In this Court's ruling on the parties' cross-motions for summary judgment, it recognized a split among federal circuit courts on this issue and determined that statutory construction supported the conclusion that the phrase refers to the ACPA.  (Doc. 97 at 9-12)  Defendant concludes that this Court's "need to analyze this issue demonstrates the issue was a debatable one, further proving that [Defendant's] defense was objectively reasonable."  (Doc. 116 at 13)

Additionally, Defendant contends its position that re-registration of a domain name resets the registration date was debatable and therefore was objectively reasonable.  (*Id.* at 13-15)    Defendant emphasizes that *GoPets* involved re-registration by an entity incorporated by the original owner of the domain name and did not involve re-registration by a subsequent unaffiliated third party.  (*Id.* at 14))  Defendant concludes that its position on re-registration by a third party unaffiliated with the original person or entity originally registering a domain name thus was debatable and fair.  (Doc. 116 at 15)

Defendant indicates that the Eleventh Circuit in *Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 771-72 (11th Cir. 2015) "flatly rejected" the Ninth Circuit's analysis in *GoPets* and that district courts in the Southern District of Florida and the District of Delaware have followed the Eleventh Circuit's reasoning in *Jysk Bed'N Linen.*  Defendant emphasizes that the *AirFX* court concluded that *GoPets* broadly applied to any re-registration and that the Ninth Circuit did not review this conclusion.  (*Id.* at 14)  Defendant also contends that Plaintiff's success on cross-motions for summary judgment is not alone sufficient for a finding that this case is exceptional and concludes Plaintiff has not met his burden to establish the right to fee shifting.  (*Id.* at 8-9, 11)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.     The Parties' Arguments on Comparable Cases**

As noted, Plaintiff cites District Judge Martone's decision awarding attorneys' fees in *AirFX* as an appropriate template for this Court's decision on Plaintiff's motion for fees. (Doc. 115 at 7, 9-10, 17)  Defendant disagrees and suggests instead that a better comparison to the instant case is provided in *Black v. Irving Materials, Inc.*, No. 17-CV-06734-LHK, 2020 WL 60202 (N.D. Cal. Jan. 6, 2020).  Each decision is discussed below.

**1.     Order on motion for attorneys' fees in AirFX**

In *AirFX*, the court noted that the plaintiffs had prevailed on summary judgment on their claim of RDNH under 15 U.S.C. § 1114(2)(D)(v) of the Lanham Act, as well as on the defendant's counterclaims asserting trademark infringement under the Lanham Act and cybersquatting pursuant to the ACPA.  *AirFX*, 2013 WL 857976, at *1.  The court concluded the defendant's counterclaims were groundless and unreasonable.  *Id.* at *2.  The court stated that before defendant filed its counterclaims, the court had notified the parties that "the original registration date of [the disputed internet domain name www.airfx.com] was the determinative issue in connection with any ACPA claims."  *Id.*  The court explained it had specifically advised the parties that the Ninth Circuit opinion in *GoPets Ltd. v. Hise* "made it clear that a company's re-registration of a domain name that was first registered 'long before [trademark owner] registered its service mark' did not violate the ACPA, because the re-registration 'was not a registration within the meaning of § 1125(d)(1).'"  *Id.*  Moreover, the court found it significant that before the defendant filed its summary judgment motion it was "undisputed" that defendant knew that the plaintiffs' domain name airfx.com was registered by the entity from whom the plaintiffs had acquired it in March 2003, more than two years before the defendant filed a trademark application for the trademark AirFX.  *Id.*  Given the defendant's awareness of the Ninth Circuit's holding in *GoPets*, the court determined that defendant should have "withdrawn its ACPA counterclaim once it discovered that the original registration date of airfx.com preceded the registration of the AirFX mark."  *Id.*  Similarly, the court found the defendant's trademark infringement counterclaim was groundless because the defendant failed to

provide any evidence that the plaintiffs' use of the AirFX mark had been commercial. *Id.* On the parties' arguments that the other party had litigated in bad faith, the court stated that while both of the parties had "been unnecessarily adversarial and uncivil," it declined to conclude that either defendant or its counsel had acted in bad faith. *Id.* at *3. The court determined the case was exceptional under § 1117(a) and that the plaintiffs were entitled to attorney fees based on the defendant's prosecution of counterclaims the court found to be "groundless and unreasonable." *Id.*

### 2.   *Order on motion for attorneys' fees in Black*

In *Black*, the plaintiff/counterdefendant ("plaintiff") filed a lawsuit asserting an RDNH claim against defendant/counterclaimant ("defendant") and requesting declaratory relief that his use of a disputed domain name was lawful and that the domain name should not be transferred to the defendant. 2020 WL 60202 at *1. The defendant counterclaimed asserting the plaintiff was a cybersquatter and requesting declaratory judgment that the domain name should be transferred from the plaintiff to the defendant. *Id.* On the parties' cross-motions for summary judgment the court:  (1) entered judgment in favor of the defendant on the plaintiff's RDNH claim because the plaintiff had alleged a violation of § 1114(2)(D)(iv), fraud in the domain dispute proceeding, in his complaint but then tried to instead assert an RDNH claim under § 1114(2)(D)(v) on summary judgment; and (2) denied summary judgment on the remaining claims/counterclaims and requests for declaratory relief. *Id.* at *7. On the completion of trial, the jury found in favor of the plaintiff and concluded he had not violated the ACPA and was entitled to declaratory relief to the effect that the plaintiff had not violated the ACPA. *Id.* at 11.

On the plaintiff's motion for attorneys' fees under 15 U.S.C. § 1117(a), the Northern District of California ruled:  (1) that the defendant's counterclaim for cybersquatting had not been objectively unreasonable; (2) the defendant's motivation in asserting the cybersquatting counter claim was not improper; (3) the plaintiff's success in obtaining a declaratory judgment that he did not violate the ACPA did not qualify his case as exceptional; and (4) that plaintiff had not reasonably litigated the case when he ignored the

court's repeated warnings that he did not "have either a claim for reverse domain name hijacking or any other affirmative claim" against the defendant, which militated against an award of attorneys' fees. *Id.* at **12-21.  The court noted that the defendant's counterclaim of cybersquatting had survived summary judgment and reasoned it would "strain logic" to hold the defendant had presented sufficient evidence to establish genuine issues of material fact on the contested elements of a counterclaim but to also find the counterclaim was objectively unreasonable based on the facts. *Id.* at *13.  The court also listed evidence that could have supported a finding of bad faith by the plaintiff.  *Id.* at **14-16.

In finding that the defendant's motivation for litigating a cybersquatting counterclaim was not improper, the court concluded that the plaintiff's argument the defendant had sought the domain name to ensure that its brand was consistent was a "wholly unremarkable" business consideration.  *Id.* at *17.  The court also rejected the plaintiff's contention the defendant was conducting itself as a "trademark bully" because the plaintiff had failed to provide any evidence in support.  *Id.*

The plaintiff argued his case was exceptional under the Lanham Act because there had been few cases in which a plaintiff had prevailed on an RDNH claim.  *Id.* at *18.  The court declined to endorse this reasoning, finding 15 U.S.C. § 1114(2)(D)(v) provided no basis for automatic fee-shifting when a plaintiff prevails.  *Id.*  Moreover, the court observed that even the cases cited by the plaintiff to support his argument followed *Octane*'s instruction to consider factors such as the substantive strength of the losing party's litigation position and the party's motivation for litigating.  *Id.*, citing *Domond v. PeopleNetwork APS*, 750 Fed.Appx. 844, 847 (11th Cir. 2018) and *AirFX*, 2013 WL 857976, at *2.

### 3.    *AirFX is the more comparable case to the instant matter*

The facts, procedural history, and issues addressed in this case and those presented in *AirFX* are closely similar.  In both cases:  (1) the plaintiffs purchased a pre-existing domain name registration; (2) the defendants in each case registered a trademark with a similar name to the plaintiffs' domain name after the domain name had been registered; (3)

the defendants filed a domain name dispute in an arbitration forum and obtained favorable rulings, including an order that the domain names be transferred from the plaintiffs to the defendants; (4) the domains were parked on a GoDaddy splash page that included third-party advertisements; (5) the plaintiffs had not used the domains to sell anything; (6) the plaintiffs requested relief regarding RDNH under the Lanham Act, 15 U.S.C. § 1114(2)(D)(5); and (7) the plaintiffs were successful on summary judgment.  Importantly, the issue of re-registration was a central issue to the determination of the *AirFX* court and to this Court.

In *Black*, the plaintiff registered the disputed domain name in 1994, while the defendant had used the comparable trademark in its business since as early as 1962.  2020 WL 60202 at *3.  The defendant filed a trademark registration application in 1994 and the trademark was registered in 1995.  *Id.*  The plaintiff placed the domain name for sale, including to the defendant, but the defendant concluded the asking price was exorbitant. *Id.* at *6.   The defendant filed a Uniform Domain Name Dispute Resolution Policy ("UDRP") complaint against the plaintiff alleging the plaintiff was cybersquatting on the domain name and seeking transfer of the domain from the plaintiff to the defendant.  *Id.* As noted, the jury in *Black* found that the plaintiff had not violated the ACPA and that the defendant was not entitled to declaratory relief.  *Id.* at *11.  As noted, the *Black* court ruled the plaintiff had failed to state a claim for RDNH when he cited to § 1114(2)(D)(iv) instead of § 1114(2)(D)(v), and a claim for RDNH had not been presented at trial.

Importantly, the determinative issue here of whether the plaintiff's registration or re-registration of the disputed domain name was unlawful under the ACPA as addressed by the Ninth Circuit in *GoPets* was not considered in *Black* because the parties agreed that registration was undisputed.  *Id.* at *12.  However, in addressing the issue of whether the plaintiff engaged in bad faith for purposes of the ACPA, the district court discounted the plaintiff's reliance on *AirFX* and concluded the plaintiff had misread *AirFX*.  *Id.* at *16. The district court noted that the plaintiff read "*AirFX.com* for the proposition that no ACPA cybersquatting counterclaim could have existed in the instant case because [the defendant]

did not actually register the [disputed] trademark with the [USPTO] until . . . after [the plaintiff] had already registered the domain name." *Id.* The court stated that "Ninth Circuit case law squarely forecloses such a reading, and indicates that a plaintiff in fact need not ever register a trademark to bring a claim for cybersquatting under the ACPA." *Id.* The *Black* court cited in support *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1222 (9th Cir. 2010), *Id.*, a Ninth Circuit case decided prior to *GoPets* that despite the district court's characterization did not expressly state that a plaintiff need not register a trademark to bring a claim for cybersquatting under the ACPA. *DSPT*, 624 F.3d at 1221-22. In any event, because neither the Ninth Circuit in *DSPT* nor the district court in *Black* addressed the question of re-registration, *Black* is not a relevant comparator case on the question of whether Plaintiff's case is exceptional. This Court finds that Defendant's reference to *Black* as a close comparator for purposes of determining whether this case is extraordinary is misplaced.

## C. Defendant's Arguments Regarding the Reasonability of its Challenge to *GoPets* Fail

Defendant argues that its decision to defend in this litigation was not baseless but rather was objectively reasonable. (Doc. 116 at 9-11) Defendant contends that its position that Plaintiff's registrations in September and December 2016 were new registrations under the ACPA was debatable and thus reasonable, particularly given a circuit court split on this question. (*Id.* at 13-15) Defendant asserts that after *AirFX*, some courts have rejected the Ninth Circuit's holding in *GoPets* on re-registration of domain names and that it was "proper" for Defendant to argue "for a new interpretation based upon developments in the law[.]" (*Id.* at 14-15) Defendant discusses *Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d at 771-72 as well as a case from the Southern District of Florida and another from the District of Delaware, each of which cited *Jysk Bed'N Linen*, and also a case from District of the District of Columbia which declined to follow *GoPets*' ruling on re-registration under the ACPA. (*Id.* (citing *Heron Dev. Corp. v. Vacation Tours, Inc.*, No. 1:16-cv-20683-MORENO/O'SULLIVAN, 2017 WL 2895921 (S.D. Fla. Apr. 13, 2017); *American*

*Cruise Lines, Inc. v. HMS American Queen Steamboat Co. LLC*, No. 13-cv-324 (RGA),
2017 WL 3528606 (D. Del. Aug. 16, 2017); *Xereas v. Heiss*, 933 F.Supp.2d 1, 15-17
(D.D.C. 2013), which disagreed with *GoPets* and held that a re-registration fell under the
ACPA.))

The Eleventh Circuit in *Jysk Bed'N Linen* addressed the expiration of registration
of a domain name followed by re-registration. 810 F.3d 767, 771-72 (11th Cir. 2015). The
district court below assumed without discussion that a re-registration was not a new
registration for purposes of the ACPA. *Id.* at 777. The Eleventh Circuit observed that the
Third and Ninth Circuits had "provided divergent answers to this question[,]" citing *GoPets*
and *Schmidheiny v. Weber*, 319 F.3d 581 (3d Cir. 2003). The Eleventh circuit noted that
the Third Circuit had concluded a re-registration of a domain name was a registration under
the ACPA, and that the statute had not limited a registration to the narrow concept of
"creation" registration. 810 F.3d at 777. The Eleventh Circuit further observed that the
Third Circuit had compared registration to a contract between the registrar and the
registrant and concluded that a registration would encompass a "new contract at a different
registrar and to a different registrant." *Id.* (citing *Schmidheiny*, 319 F.3d at 583).

The Eleventh Circuit explained that the Ninth Circuit in *GoPets* had relied instead
on property law principles to conclude that a registrant obtains a property right in a domain
name when it is registered and thus has the right to transfer the property to another owner.
*Id.*, citing *GoPets*, 657 F.3d at 1031. The Eleventh Circuit noted the Ninth Circuit's
concern that if it held a re-registration were a registration under the ACPA, this would
"'make rights to many domain names effectively inalienable, whether the alienation is by
gift, inheritance, sale or other form of transfer.'" *Id.*, quoting *GoPets*, 657 F.3d at 1031-
32. Nevertheless, the Eleventh Circuit agreed with the Third Circuit, concluding that the
plain meaning of the term "register" within the ACPA must include a "re-registration,"
because the ACPA did not expressly qualify the act of registering with terms such as
"initial" or "creation." *Id.* Moreover, the Eleventh Circuit discerned a policy basis for its
conclusion. In its view, allowing a re-registration to fall within the ACPA would enable

the new registrant of a trademarked domain name to then offer the registered domain name for sale to the trademark owner, which would permit cybersquatting, which was "exactly the wrong Congress intended to remedy when it passed the ACPA." *Id.* at 777-78 (citation and internal quotation marks omitted).

Defendant's argument that a circuit split on the question of re-registration under the ACPA rendered Defendant's litigation of this question reasonable ignores the important policy considerations imposed by federal appellate courts that are expressed in the doctrine of the "law of the circuit." "Law of the circuit is stare decisis, by another name. The doctrine requires that we 'stand by yesterday's decisions'—even when doing so 'means sticking to some wrong decisions.'" *East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1261 (9th Cir. 2020) (quoting *Kimble v. Marvel Entm't, LLC*, 576 U.S. 446, 455 (2015)). Published decisions of the Ninth Circuit become law of the circuit, which is binding authority that the Ninth Circuit and district courts within the circuit must follow until overruled. *Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001). Overruling authority includes only intervening statutes or Supreme Court opinions that create "clearly irreconcilable" conflicts with published Ninth Circuit caselaw. *Miller v. Gammie*, 335 F.3d 889, 893, 900 (9th Cir. 2003) (en banc). A district court is not free to disagree with a decision by its own court of appeals on a controlling legal issue because such binding authority "is not merely evidence of what the law is[,]" but rather "caselaw on point *is* the law." *Massanari*, 266 F.3d at 1169 (emphasis in original).

The Ninth Circuit also has recognized that while its published opinions are binding within the Ninth Circuit:

> courts of appeals, and even lower courts of other circuits, may decline to follow the rule we announce—and often do. This ability to develop different interpretations of the law among the circuits is considered a strength of our system. It allows experimentation with different approaches to the same legal problem, so that when the Supreme Court eventually reviews the issue it has the benefit of "percolation" within the lower courts.

*Id.* at 1173.

In *Massanari*, the Ninth Circuit instructed that a published, precedential opinion "must not only consider the facts of the immediate case, but must also envision the countless permutations of facts that might arise in the universe of future cases." *Id.* at 1176. Here, Defendant claims it was "free to attempt to distinguish *GoPets* on the basis that [Plaintiff's] was a re-registration by a third party." (Doc. 116 at 15) However, as the *AirFX* court concluded, *GoPets* did not limit its holding to parties affiliated with the original registrant of a domain name.

In its August 2012 order on summary judgment, the *AirFX* court addressed the defendant's argument that the Ninth Circuit's reasoning in *GoPets* could be distinguished because the domain name owner had transferred the domain name to an entity the owner co-owned, whereas the individual plaintiff in *AirFX* had purchased the domain name at issue from a third party unrelated to the plaintiff. The court concluded that:

> *GoPets* did not distinguish between transfers of a domain name to related parties and other kinds of domain name transfers. To the contrary, *GoPets* broadly reasoned that if an original owner's rights associated with a domain name were lost upon transfer to "another owner," the rights to many domain names would become "effectively inalienable," a result the intention of which was not reflected in either the structure or the text of the ACPA. [*GoPets*, 657 F.3d] at 1031–32.

*AirFX.com v. AirFX LLC*, No. 2:11-cv-01064-FJM, 2012 WL 3638721, at *4 (D. Ariz. Aug. 4, 2012).

This Court agrees with District Judge Martone's conclusion in *AirFX*. It is plain that the Ninth Circuit did not intend for its holding in *GoPets* to apply only where an initial registrant transfers a domain name to an affiliated party and that the holding in *GoPets* would not extend to instances where the registrant transfers the domain name to an unrelated third party. The Ninth circuit explained:

> The words "registration" and "register" are not defined in ACPA. It is obvious that, under any reasonable definition, the initial contract with the registrar constitutes a "registration" under ACPA. It is less obvious which later actions, if any, are also "registrations." After registering, a registrant can take a variety of actions that modify the registration. For instance, the registrant can update the registration if her contact or billing information

1
2
3
4
5
6
7

> changes.  She can switch to "private" registration, where a third party's name
> is substituted for hers in the public databases of domain registrants.  She can
> switch between registrars, but leave her contact and billing information
> unchanged.  A registrant can change the name of the registrant without
> changing who pays for the domain, or a registrant can transfer both the
> domain and payment responsibilities to someone else.  Even if the registrant
> does none of these things, she must still renew the registration periodically.
> All of these actions could conceivably be described as "registrations" within
> the meaning of § 1125(d)(1).

8
9
10
11

*GoPets,* 657 F.3d at 1030-31.  As noted, the Ninth Circuit recognized that a registrant of a domain name could transfer the domain to "someone else."  The court then assessed the transfer of a registered domain name under property right principles and concluded that it could:

12
13
14
15
16
17

> see no basis in ACPA to conclude that a right that belongs to an initial
> registrant of a currently registered domain name is lost when that name is
> transferred to another owner.  The general rule is that a property owner may
> sell all of the rights he holds in property.  GoPets Ltd.'s proposed rule would
> make rights to many domain names effectively inalienable, whether the
> alienation is by gift, inheritance, sale, or other form of transfer.  Nothing in
> the text or structure of the statute indicates that Congress intended that rights
> in domain names should be inalienable.

18
19
20
21
22
23

*Id.* at 1031-32.  The Ninth Circuit's discussion of transfers of a domain name does not support Defendant's argument that the Ninth Circuit intended to limit such transfers only to a party affiliated with the original registrant.  And, as Defendant observes, the Ninth Circuit has not altered its analysis of re-registration since it published *GoPets*.  (Doc. 116 at 14)  Defendant does not claim that intervening statutes or Supreme Court opinions have created clearly irreconcilable conflicts with *GoPets*.

24
25
26
27
28

Further, Defendant's other arguments asserted to establish the reasonableness of its defense do not overcome the obstacle posed by the Ninth Circuit's ruling in *GoPets*. Defendant asserts that its defense was reasonable because it held valid trademarks, did not bring any counterclaims, and was merely defending its rights.  (Doc. 116 at 9-10) However, the fact that Defendant held valid trademarks is a required element to a claim

under the ACPA and does not provide a basis for Defendant's argument that his litigation of this case was reasonable given the law in this circuit.  Defendant further contends its litigation was reasonable because it prevailed in its case before WIPO.  This circumstance may support a parties' argument for litigating a case in federal court under other circumstances, but because a WIPO panelist's decision is entitled to no deference in deciding a claim pursuant to 15 U.S.C. § 1114(2)(D)(v), *Barcelona.com, Inc. v. Excelentisimo Ayuntamiento De Barcelona*, 330 F.3d 617, 626 (4th Cir. 2003), Defendant's success in non-binding arbitration with WIPO also does not overcome Defendant's problem with the law of the circuit established in *GoPets*.[6]

Defendant further argues that its litigation in this matter was reasonable because it argued that the phrase "under this chapter" in § 1114(2)(D)(2) refers to the Lanham Act as a whole rather than only to the ACPA.  (Doc. 116 at 12-13)  Defendant concludes that although this Court rejected its argument, the fact that this Court analyzed and discussed the issue establishes that Defendant's defense was reasonable.  (*Id.* at 13)  In Defendant's motion for summary judgment, it contended that if the phrase were limited to apply only to the ACPA, a cybersquatter acting in bad faith with a claim for RDNH could gain control of an infringing domain name despite having violated the Lanham Act.  (Doc. 83 at 17)  However, the evidence in this case clearly does not support such a circumstance even if this Court had agreed with Defendant's position.

In its March 11, 2020, order on cross-motions for summary judgment, this Court found there was no evidence of Plaintiff's unlawful use of the disputed domain names or of bad faith on Plaintiff's part by registering the domain names.  (Doc. 97 at 17)  This Court further found no evidentiary support for a finding that Plaintiff obtained the domain names intending to sell them to Defendant, that Plaintiff had any plan to profit by diverting potential customers from Defendant's websites to Plaintiff's websites, or that Plaintiff was aware of Defendant when he acquired the domain names.  (*Id.* at 17-19)  Similarly, this

---

[6] The Fourth Circuit further observed that "because a UDRP decision is susceptible of being grounded on principles foreign or hostile to American law, the ACPA authorizes reversing a[n arbitration] panel decision if such a result is called for by application of the Lanham Act."  *Barcelona.com, Inc.*, 330 F.3d at 62.

1    Court found no evidence that Plaintiff possessed control over content placed on the parking

2    pages holding the domain names or had any intent to divert consumers from the parking

3    pages for commercial gain.  (*Id.* at 20)  Moreover, this Court concluded that under the

4    undisputed material facts, Plaintiff did not act in bad faith and qualified for the safe harbor

5    under the ACPA.  (*Id.* at 17-20)  Given these findings based on the evidence, Defendant's

6    arguments concerning both re-registration of the domain names and application of the

7    phrase "under this chapter" were unreasonable.

8        **D.     Defendant's litigation under the totality of the circumstances in this case**

9    **was not reasonable in light of *GoPets*; this case is exceptional for purposes of an award**

10   **of attorney fees under § 1117(a)**

11       Defendant's defense was premised on its argument that Plaintiff's registration was

12   not lawful pursuant to 15 U.S.C. § 1114(2)(D)(v), that the Ninth Circuit's reasoning and

13   decision in *GoPets* had been rejected by other federal courts, and that even if *GoPets* was

14   the correct application of law, Defendant's case was distinguishable on the facts.  As is

15   discussed above, however, the published decision in *GoPets* is the precedential law in the

16   Ninth Circuit.  *Massanari*, 266 F.3d at 1169.  As is further addressed above, the *GoPets*

17   opinion does not support Defendant's attempts to escape its reach based on the facts

18   presented in this case.  Accordingly, this Court finds that Defendant's defense was without

19   merit and this case is exceptional under *Octane Fitness*.

20       This Court does not find that Defendant pursued its defense with improper

21   motivation or that the facts presented support a finding that fees are warranted to advance

22   policies of compensation or deterrence.  *See Octane Fitness, LLC*, 572 U.S. at 1756 n.6.

23   Instead, as the Court concluded in *AirFX* on closely comparable facts, here "[n]either the

24   factual basis for [the Court's] conclusion, nor the law compelling it, were genuinely subject

25   to dispute."  2013 WL 857976 at *2.  *See also Dropbox, Inc. v. Thru Inc.*, 728 Fed.Appx.

26   717, 719 (9th Cir. 2018) (holding the district court did not abuse its discretion in awarding

27   fees under § 1117(a) in part based on a finding that the defendant's counterclaims were

28   "wholly lacking in merit"); *Ketab Corp. v. Mesriani Assocs., P.C.*, 734 Fed.Appx. 401,

411-12 (9th Cir. 2018) (affirming district court's award of § 1117(a) attorneys' fees after finding the plaintiff's arguments were "groundless, frivolous, and unreasonable[.]"); *Amusement Art, LLC v. Life is Beautiful,* LLC, 768 Fed.Appx. 683, 687 (9th Cir. 2019) (holding the defendant was entitled to attorneys' fees on Lanham Act claims where plaintiff fraudulently obtained trademark registrations and because trademark claims were weak).

In the exercise of equitable discretion, considering the preponderance of the evidence standard, and under the totality of circumstances, this Court finds that this case "stands out from others" and is exceptional such that § 1117(a) attorneys' fees are warranted.

**E.     Plaintiff's Request for Reasonable Attorney Fees is Reduced to Account for Unsuccessful Claims in the Complaint**

Plaintiff requests attorneys' fees totaling $243,991.50.   (Doc. 115 at 4)   As is detailed above, Defendant argues Plaintiff is not entitled to an award of attorneys' fees because this case is not exceptional.   However, Defendant states it does not contest the hourly rates claimed by Plaintiff's counsel and does not specifically object to the hours claimed other than to state that Plaintiff has made "no attempt to cull out time spent on the 3 of 5 claims on which [Defendant] was successful."  (Doc. 116 at 8 n.1)

The Lanham Act permits an award of "reasonable" attorneys' fees to "the prevailing party" in an "exceptional case."  15 U.S.C. § 1117(a).  This Court finds that Plaintiff is the prevailing party.  A party is a prevailing party for purposes of an attorneys' fee award under § 1117(a) if it "'achieved a material alteration in the legal relationship of the parties that is judicially sanctioned.'"  *Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1078 (9th Cir. 2015) (quoting *Klamath Siskiyou Wildlands Ctr. v. U.S. Bureau of Land Mang.*, 589 F.3d 1027, 1030 (9th Cir. 2009) (internal quotation marks omitted)). "'The material alteration in the legal relationship of the parties must be relief that the would-be prevailing party sought.'"  *Id.*  The Ninth Circuit has further recognized that a "party need not succeed in all of its claims to be the prevailing party." *Id.* (citing *San Diego Police Officers' Ass'n v. San Diego City Emps.' Ret. Sys.*, 568 F.3d 725, 741 (9th Cir.

2009).  Here, because this Court found Plaintiff's registration of the disputed domain names was not unlawful under the ACPA or the Lanham Act and ordered that the domain names remain registered to Plaintiff for his lawful use, Plaintiff obtained "a material alteration in the legal relationship of the parties that is judicially sanctioned" and he is the prevailing party.

Although Defendant does not dispute that Plaintiff is the prevailing party for purposes of attorney fees, it notes that Plaintiff did not prevail on all his claims.  (Doc. 116 at 11-12)  Defendant accurately indicates that its motion to dismiss Plaintiff's claims for fraud pursuant to § 1114(2)(D)(iv) and for tortious interference was granted and that Plaintiff did not pursue his claim for statutory damages under 15 U.S.C. § 1117(d) in his October 9, 2019, motion for summary judgment.  (*Id.*)  In his complaint, Plaintiff requested statutory damages pursuant to 15 U.S.C. § 1117(d) in an amount of between $1,000 and $100,000 per domain name because his action involved the Defendant's argument that Plaintiff had violated 15 U.S.C. § 1125(d)(1).  (Doc. 1 at 13)  However, Plaintiff did not seek summary judgment on his claim for § 1117(d) damages.

A court determines a reasonable attorneys' fee award by reference to the lodestar calculated by multiplying the number of hours reasonably expended on litigation times a reasonable hourly rate.  *Jordan v. Multnomah Cnty.*, 815 F.2d 1258, 1262 (9th Cir. 1987) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).  To determine a reasonable number of hours, the court reviews the record to assess whether the hours claimed by the applicant are adequately documented and whether any of the time claimed was unnecessary, duplicative, or excessive.  *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986).  In considering whether hourly rates are reasonable, a court looks to the prevailing rate in the community for similar work performed by attorneys of comparable skill, experience, and reputation.  *Id.* at 1210-11.  The party seeking fees bears the burden of establishing entitlement to fees and submitting supporting evidence.  *Hensley*, 461 U.S. at 433, 437.  A court may reduce an award based on inadequate documentation of hours or rates requested.  *Id.* at 433.

Plaintiff was represented by the firm of Schmeiser, Olsen & Watts, LLP of Mesa, Arizona ("SOW"), and by John Berryhill, a Pennsylvania attorney appearing *pro hac vice*. In his affidavit, Jeffrey W. Johnson, an of counsel attorney with SOW, attests he recorded 522.2 hours on this matter and billed at hourly rates of $340 and $390.  (Doc. 115-2 at 3, 5)  Mr. Johnson further states that:  Sean K. Enos, Senior Partner, recorded 11.6 hours on the case at hourly rates of $475 and $520; Albert L. Schmeiser, Managing Partner, recorded 2.5 hours at hourly rates of $525 and $575; associate attorney Karl Webster recorded 22.4 hours at an hourly rate of $200; and Mr. Berryhill recorded 27 hours at an hourly rate of $350.  (*Id.*)  Mr. Johnson declares that paralegals with SOW recorded 61 hours at an average hourly rate of $144.30.  (*Id.* at 6)  Mr. Johnson explains that all attorneys working on this case practice in the area of intellectual property and that these attorneys have practiced intellectual property law for between 14 and 21 years, with the exception of Mr. Webster, who was a first-year associate at the time of the work he performed for Plaintiff.  (*Id.* at 3-4)  Mr. Johnson avers that the rates billed in this matter are reasonable in the Phoenix, Arizona legal market and cites to a national survey of billing rates by intellectual property lawyers in 2016.  (*Id.* at 6-7)

This Court concludes that the hourly rates billed in this matter are reasonable given the respective attorneys' specialization and experience.  *See BoxNic Anstalt v. Gallerie degli Uffizi*, No. CV-18-1263-PHX-DGC, 2020 WL 2991561, at *2 (D. Ariz. June 4, 2020) (concluding that hourly rates of $695 to $725 for an experienced partner practicing in intellectual property and of $520 to $575 for a senior associate were reasonable, and further concluding that hourly rates of $250 for associate attorneys and of $150 for paralegals were reasonable in the Phoenix, Arizona legal market); *Kaufman v. Warner Bros. Entm't Inc.*, No. CV-16-02248-PHX-JAT, 2019 WL 2084460, at *12 (D. Ariz. May 13, 2019) (an hourly fee of law firm partner with over three decades of experience in intellectual property actions ranging between $552.00 to $715.00 was reasonable); *Jackson v. Wells Fargo Bank, N.A.*, No. CV-13-00617-PHX-SPL, 2015 WL 13567069 at *2 (D. Ariz. Oct. 23, 2015) ("The best indicator of a reasonable hourly rate for a fee-paying client is the rate

1    charged by the lawyer to the client.").

2           Moreover, Mr. Johnson's affidavit (Doc. 115-2) and time sheets (Doc. 115-3)

3    provide sufficient detail to permit the Court to determine that the substantial amount of

4    time spent on this case was reasonable.  This Court has carefully reviewed Plaintiff's

5    counsel's time records which cover the period between March 2017 and November 2019.

6    The time records detail significant time devoted to discovery (Doc. 115-3 at 29-39, 41-43,

7    46-47, 50-51, 54-55, 58-61, 63-66, 68, 70); preparation for and participation in a settlement

8    conference and other settlement negotiations (*Id.* at 10, 46-47, 70-71); and preparing

9    Plaintiff's motion for summary judgment and extensive supporting documents as well as

10   responding to Defendant's motion for summary judgment (*Id.* at 65-66, 70-71, 73-86).

11          In setting a reasonable fee, a court should apportion fees between claims on which

12   the successful party prevailed and claims on which the party did not prevail.  *Gracie v.*

13   *Gracie*, 217 F.3d 1060, 1071 (9th Cir. 2000).  As noted, in an order dated February 12,

14   2018, the Court dismissed without prejudice Plaintiff's claims for tortious interference and

15   for fraud pursuant to § 1114(2)(D)(iv).  (Doc. 17)  Accordingly, attorneys' fees attributable

16   to these claims should be excluded from an award under § 1117(a).

17          Plaintiff's counsel's billing records indicate that time recorded by counsel and

18   paralegals associated with the complaint and Plaintiff's response to Defendant's motion to

19   dismiss claims totals $12,065.00. (Doc. 115-3 at 2, 4, 8, 14, 16, 18, 19) Because two of

20   Plaintiff's five claims for relief were dismissed (Doc. 17), this Court will exclude forty

21   percent of this total, or $4,826.00, from Plaintiff's requested fees.

22          Plaintiff also declined to assert his claim for statutory damaged under 15 U.S.C. §

23   1117(d) in his motion for summary judgment filed in October 2019.  (Doc. 86)  Section

24   1117(d) provides that "[i]n a case involving a violation of section 1125(d)(1)," the plaintiff

25   may elect statutory damages instead of actual damages and profits and seek "an award of

26   statutory damages in the amount of not less than $1,000 and not more than $100,000 per

27   domain name, as the court considers just."  15 U.S.C. § 1117(d).  Here, Plaintiff initially

28   sought declaratory relief that his registration of the disputed domain names did not violate

Defendant's rights under § 1125(d)(1).  However, aside from alleging Plaintiff's right to statutory damages pursuant to § 1117(d) in the complaint, there is no record that Plaintiff's counsel devoted any time specifically to this claim for damages between filing Plaintiff's response to Defendant's motion to dismiss and when Plaintiff filed his motion for summary judgment, which did not argue for statutory damages.  Accordingly, this Court will deduct an additional twenty percent of attorneys' fees associated with the complaint and Plaintiff's response to Defendant's motion to dismiss, or an additional $2,413.00.  Accordingly, attorneys' fees that will be excluded as attributable to Plaintiff's claims that were dismissed or not asserted on summary judgment total $7,239.00.  Subtracting excluded attorneys' fees of $7,239.00 from Plaintiff's claimed fees of $243,991.50 leaves a remainder of $236,752.50.

## IV.   CONCLUSION

For the reasons set forth above, this Court will grant Plaintiff's motion and award attorneys' fees of $ 236,752.50.

Accordingly,

**IT IS ORDERED granting** Plaintiff's Motion for Attorneys' Fees as set forth herein.  (Doc. 115)

**IT IS FURTHER ORDERED** awarding Plaintiff $ 236,752.50 in attorneys' fees.

Dated this 25th day of January, 2021.

_____
Honorable Deborah M. Fine
United States Magistrate Judge

- 23 -